# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431

---

| | |
|---|---|
| Appellate Court Caption | FRANCISCAN COMMUNITIES, INC., Plaintiff-Appellant, v. BRIAN A. HAMER, Director of the Department of Revenue, THE DEPARTMENT OF REVENUE, THE LAKE COUNTY BOARD OF REVIEW, and THE BOARD OF EDUCATION OF LAKE VILLA COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 41, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-11-0431 |
| Filed | August 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff religious organization was not entitled to a religious-use or a charitable-use property tax exemption for its continuing care retirement community, except for the chapel, since the primary use of the property was for upscale senior housing and care, the Department of Revenue's determination that the property was operated with a view to profit was not clearly erroneous, and the factors considered in determining whether property is used exclusively for charitable purposes weighed in favor of taxation. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09-MR-1830; the Hon. Margaret J. Mullen, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

John J. Durso, Edward Clancy, Timothy E. Horton, Seth A. Horvath, and Emily M. Dierberg-Armstrong, all of Ungaretti & Harris LLP, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Evan Siegel, Assistant Attorney General, of counsel), for appellees Brian A. Hamer and Department of Revenue.

Vanessa V. Clohessy and Steven M. Richart, both of Hodges, Loizzi, Eisenhammer, Rodick & Kohn, LLP, of Arlington Heights, for appellee Board of Education of Lake Villa Community Consolidated School District No. 41.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.

Justices McLaren and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Franciscan Communities, Inc. (FC), appeals from an order of the circuit court of Lake County affirming the decision of the Director of the Illinois Department of Revenue (DOR) to deny FC's application for a property tax exemption, except for the chapel, based on claimed religious and charitable uses of its property in Lindenhurst, Illinois. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    FC owns a continuing care retirement community (CCRC) called the Village at Victory Lakes (VL), which is located in Lindenhurst, Illinois. FC is a not-for-profit corporation of the Franciscan Sisters of Chicago Service Corporation, Inc. (FSCSC), which is owned by the Franciscan Sisters of Chicago (Sisters), a pontifical institute of religious women that is part of the Roman Catholic Church and reports to the Pope.

¶ 4    FC filed an application seeking exemption from 2007 real estate taxes for VL. The Lake County board of review (BOR) recommended that the exemption be denied, and the DOR accepted the BOR's recommendation. FC appealed the DOR's denial, and the Board of Education of Lake Villa Community Consolidated School District No. 41 (school district) was given leave to intervene upon a showing that its revenues would be adversely affected if FC received a property tax exemption. Following an extensive evidentiary hearing, the administrative law judge (ALJ) recommended that the DOR's denial be affirmed, with the

-2-

exception of allowing exemption for the property's chapel. The Director of the DOR accepted the ALJ's recommendation, and FC filed a complaint seeking administrative review in the circuit court of Lake County, which affirmed the Director's decision. FC filed this timely appeal.

¶ 5     The record includes the following relevant evidence that was adduced at the hearing before the ALJ. In 2007, VL provided several tiers of services to seniors: independent living apartments and garden homes; assisted living units; and a skilled nursing center, which included an Alzheimer's unit, rehabilitation facilities, a Medicare program, and general long-term care. The concept of the CCRC was that healthy, active seniors would enter the community at the independent living level and avail themselves of the other tiers as their health declined. Amenities, such as a beauty salon and country store, were located on VL's premises.

¶ 6     VL required a 90% refundable entrance fee plus a monthly service package for the independent living garden homes. Depending on the home's style and square footage, the entrance fees in 2007 ranged from a low of $244,186 with a monthly service package of $1,248, to a high of $332,608 with a monthly service package of $1,771. The amount of the monthly service package increased if a second person were to inhabit the home. The 90% refundable entrance fees for independent living apartments ranged from a low of $127,596 (472 square feet) with a monthly service package of $1,630, increasing, based on square footage, to a high of $252,525 (951 square feet) with a monthly service package of $2,445. An individual garage was an additional $88 per month, and the service package for a second person was $667. Monthly fees for the assisted living units began at $3,881.36 and increased to $4,741.16, depending upon the style of unit. A second person paid an additional $648.72 per month. Prior to admission, one month's fee was due in advance as well as a second month's fee to cover a security deposit. In 2007, the basic daily fee was $167 for intermediate care and $197 for skilled, Alzheimer's, and respite care. VL charged an additional daily fee for a private room. There were ancillary charges for things like activities, physical therapy, speech therapy, occupational therapy, nursing services and supplies, and beauty shop, escort, and dietary services.

¶ 7     Residency agreements for the independent living units provided for termination of residency under certain conditions, for instance, if a resident filed for bankruptcy protection or failed to pay the monthly service fee or other amounts owed to VL when due, unless other mutually satisfactory arrangements were made. In 2007, VL's gross revenue from its residents was $17.4 million. Net revenue from residents was $15.6 million. Operating earnings before income tax, depreciation, and amortization were $1.5 million.

¶ 8     FC provided "Gift of Care" assistance for new and existing residents if their other resources had been exhausted. The considerations for a "Gift of Care" were the availability of financial assistance funds; the resident's total assets; the resident's ability to obtain third-party reimbursement; the resident's seniority; and the date of the "Gift of Care" application. In 2007, not every application for "Gift of Care" assistance was approved. Funds advanced under a "Gift of Care" were recoverable by VL from the resident's 90% refundable fees (or the resident's estate).

¶ 9        It was undisputed that the Roman Catholic Church (Church) and the Sisters were religious organizations. The Sisters participate in the religious life of the Church. Their specific "charism" (the spirit that impels their particular apostolate[1]) is to give service to the elderly. They carry this out by operating (through their corporations) CCRCs. Stewardship is one of their values, meaning that they must operate their CCRCs as businesses so that they can continue and expand their service to the aged and infirm. In 2007, none of the Sisters lived at VL, which they purchased from a secular entity in 2006. The Sisters maintained a presence at VL through its vice-president and its director of mission integration and pastoral care. Through these persons, religious ceremonies, and occasional visits by some of the Sisters, the Sisters' spirit and values were transmitted to VL's employees, who were not all Catholics. Neither were all of the residents Catholics, nor were they required to be believers. For this reason, the Sisters did not place religious icons or art in the residents' homes, apartments, and units, although religious symbols were placed in public areas. When the Sisters purchased VL, the chapel was being used for parties and book fairs. The Sisters instructed that those uses cease, and they required that the chapel be used exclusively for reflection and worship, having installed a tabernacle and Eucharist. Mass was said in the chapel. Hymn singing, Bible studies, and the Rosary were held in other parts of the premises.

¶ 10                            II. ANALYSIS

¶ 11       We review the administrative agency's decision rather than the trial court's decision. *Armenian Church of Lake Bluff v. Department of Revenue*, 2011 IL App (1st) 102249, ¶ 2. Where resolution of the case requires determining the legal effect of a given set of facts, the agency's decision should be affirmed unless it is clearly erroneous. *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 693 (2008). Here, our inquiry is whether the facts satisfy a statutory standard for tax exemption; hence, we apply the clearly erroneous standard of review. *Three Angels*, 381 Ill. App. 3d at 693. In reviewing the agency's determination on a mixed question of law and fact for clear error, we give significant deference to the agency's experience in construing and applying the statutes that it administers. *Three Angels*, 381 Ill. App. 3d at 693. An agency's decision is clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed. *Three Angels*, 381 Ill. App. 3d at 693.

¶ 12       Under Illinois law, taxation is the rule, and tax exemption is the exception. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 388 (2010) (plurality op.) (*Provena II*). All property is subject to taxation unless it is exempt by statute, and statutes granting exemptions must be strictly construed in favor of taxation. *Provena II*, 236 Ill. 2d at 388. The party claiming an exemption must prove by clear and convincing evidence that the subject property falls within both the constitutional authorization and the terms of the statute under which the exemption is claimed. *Provena II*, 236 Ill. 2d at 388. A basis for exemption cannot be inferred where none has been demonstrated. *Provena II*, 236 Ill. 2d at 388. All facts are construed, and all debatable questions resolved, in favor of taxation.

--------

[1]The apostolate is the fulfillment of the Sisters' mission in the world.

*Provena II*, 236 Ill. 2d at 388. Every presumption is against the intention of the state to exempt property from taxation. *Provena II*, 236 Ill. 2d at 388.

¶ 13    Article IX of the Illinois Constitution provides that the General Assembly may exempt all property used exclusively for religious and charitable purposes. Ill. Const. 1970, art. IX, § 6; *Fairview Haven v. Department of Revenue*, 153 Ill. App. 3d 763, 770 (1987). Section 15-40(a)(1) of the Illinois Property Tax Code (Code) (35 ILCS 200/15-40(a)(1) (West 2006)) provides, "Property used exclusively for *** religious purposes *** qualifies for exemption as long as it is not used with a view to profit." Pursuant to section 15-65 of the Code, in order to qualify for a charitable exemption, the subject property must be "actually and exclusively" used for "charitable or beneficent purposes, and not leased or otherwise used with a view to profit." 35 ILCS 200/15-65 (West 2006). Property satisfies the exclusive-use requirement of the property tax exemption statutes if it is used *primarily* for the exempted purpose. *McKenzie v. Johnson*, 98 Ill. 2d 87, 98 (1983). Where property is used for two purposes, one of which is exempt and one of which is not, a tax should be imposed against the part of the property that does not qualify for exemption. *Fairview*, 153 Ill. App. 3d at 771.

¶ 14                    1. FC's Religious Exemption Claim

¶ 15    FC contends that the DOR's conclusion that VL was not used in 2007 primarily for religious purposes was clearly erroneous. FC reasons that, since FC's religious purpose is to provide care and housing to seniors, the law requires the conclusion that FC operates VL exclusively for religious purposes. FC further contends that constitutionally the DOR cannot deny the religious exemption on the ground that VL is operated with a view to profit, because canon law requires the Sisters to be good stewards of their property and, following canon law, stewardship, which dictates a business-like operation, is one of the Sisters' religious values. FC additionally argues that the ALJ's finding that the Sisters could accomplish their religious purpose through other means unconstitutionally infringed on their free-exercise right, because serving and housing the aged is their religious charism. In essence, FC claims that constitutionally the courts cannot inquire into either FC's stated religious purpose in operating VL or its stated use of the property as primarily religious.

¶ 16    The first amendment to the United States Constitution (U.S. Const., amend. I) and article I of the Illinois Constitution (Ill. Const. 1970, art. I, § 3) provide that government may not inhibit the free exercise of religion or act to foster any particular belief. *Fairview*, 153 Ill. App. 3d at 772. Consequently, governmental bodies are precluded from resolving disputes based on religious doctrine and must respect the autonomy of religious organizations. *Fairview*, 153 Ill. App. 3d at 772. "In the tax context, the first amendment requires the court to accept the entity's characterization of its activities and beliefs as religious as long as the characterization is in good faith." *Fairview*, 153 Ill. App. 3d at 773. Neither a court nor an administrative agency may go behind the entity's declared content of its religious beliefs or examine the validity of those beliefs. *Fairview*, 153 Ill. App. 3d at 773. Here, FC spent hours and days proving what no one disputed: that the Roman Catholic Church is a religious organization, that the Sisters are a religious organization within the Roman Catholic Church, and that the Sisters' charism is to serve the elderly. It is similarly undisputed that the Sisters

purchased VL because there was no Catholic CCRC in Lake County. Therefore, it is undisputed that VL is a means for the Church and the Sisters to carry out the mission of Christ's healing. Neither the ALJ nor the DOR either examined or rejected FC's characterization of the beliefs of the Church or the Sisters. The ALJ found that those beliefs were sincere. Accordingly, the DOR did not unconstitutionally inquire into the content or validity of FC's beliefs or stated purpose in operating VL.[2]

¶ 17    FC maintains that, by inquiring into FC's actual operation of VL to determine whether the property was used exclusively for religious purposes, the DOR violated the first amendment, because it questioned canon law and the Archbishop of Chicago's decrees with respect to how the property was used. It is FC's position that civil authorities must accept not only a religious organization's characterization of its beliefs but also the entity's characterization of its use of the subject property. Under this theory, no property taxes could ever be imposed on any property a religious organization declared was used exclusively for religious purposes, regardless of the true facts. This is contrary to established law. Courts are permitted to determine whether property is in fact used exclusively for religious purposes. *Fairview*, 153 Ill. App. 3d at 773. "A court must *** take into account the facts and circumstances regarding how the property is actually used." *Provena II*, 236 Ill. 2d at 409.

¶ 18    We digress to discuss the import of *Provena II*. The parties dispute its precedential value. *Provena II* is a plurality opinion by Justice Karmeier, Chief Justice Fitzgerald, and Justice Thomas. Justices Kilbride and Garman did not participate in the decision. Justices Burke and Freeman joined in that part of the plurality opinion that held that the taxpayer failed to demonstrate that it was entitled to a religious-use exemption. *Provena II*, 236 Ill. 2d at 411 (Burke, J., concurring in part and dissenting in part, joined by Freeman, J.). Justices Burke and Freeman also joined in the plurality opinion's conclusion that the taxpayer failed to establish that it was a charitable institution. *Provena II*, 236 Ill. 2d at 411 (Burke, J., concurring in part and dissenting in part, joined by Freeman, J.). However, Justices Burke and Freeman did not agree with the reasoning the plurality opinion employed to reach the conclusion regarding the charitable exemption. It is a "hornbook" principle of practice and procedure that no appellate pronouncement becomes binding on inferior courts unless it has the concurrence of a majority of the judges qualified to decide the case. *State ex rel. James v. ACLU of Alabama*, 711 So. 2d 952, 964 (Ala. 1998). Accordingly, the analysis in that part of *Provena II* pertaining to the religious-use exemption is precedential, because a majority joined in both the result and the reasoning. That part of the analysis in *Provena II* pertaining to the charitable exemption is not binding authority, as Justice Burke noted in the partial dissent. *Provena II*, 236 Ill. 2d at 416-17 (Burke, J., concurring in part and dissenting in part, joined by Freeman, J.). Consequently, we consider, and rely on, only that part of *Provena II* that discusses the religious-use exemption.

¶ 19    We must indulge in another digression related to the *Provena* cases. In its reply brief, FC raises the argument for the first time that the ALJ's citation of the appellate court's decision

---

[2]Later in this opinion, we will expand our discussion of the ALJ's finding that operation of VL was not necessary to accomplish the Sisters' religious purpose.

in *Provena Covenant Medical Center v. Department of Revenue*, 384 Ill. App. 3d 734 (2008) (*Provena I*), is reversible error. This argument is forfeited for two reasons. First, arguments may not be raised for the first time in reply briefs. *Villanueva v. Toyota Motor Sales, U.S.A., Inc.*, 373 Ill. App. 3d 800, 802 (2007). FC cannot say that it was responding to the DOR's brief, which cited *Provena I*, because the issue of whether it was error for the ALJ to rely on the appellate court's decision was already known to FC when it filed its opening brief. Second, FC gives no reason and cites no authority to support why it believes that the ALJ's reliance on *Provena I* was reversible error. Failure to argue a point results in forfeiture of the issue. *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010). Both argument and citation to relevant authority are required. *Vancura*, 238 Ill. 2d at 370.

¶ 20        Having clarified the extent to which *Provena II* is binding on this court, we note that the taxpayer in *Provena II* made the identical argument as FC–that the religious authorities, rather than courts, determine the use of the subject property–which our supreme court rejected. *Provena II*, 236 Ill. 2d at 410 ("If [Provena's] argument were valid, it would mean that the church rather than the judiciary is the ultimate arbiter of when and under what circumstances church property is exempt from taxation \*\*\*."). Indeed, for this court to hold that canon law trumps civil law and that the Archbishop's determination precludes judicial review would itself run afoul of the establishment clause of the first amendment. We would be blatantly fostering particular religious beliefs. Furthermore, even if we were to assume, *arguendo*, that FC's use of the property was exclusively for religious purposes, we would still have to inquire whether the subject property was "used with a view to profit." Under the plain language of section 15-65 of the Code, in order to meet its burden that it is entitled to a religious-use exemption, the taxpayer must introduce evidence not only that its primary use of the subject property is religious but also that it is not using the property with a view to profit. *Three Angels*, 381 Ill. App. 3d at 696.

¶ 21        FC challenges as unconstitutional that portion of the ALJ's recommendation that FC says restricts religious use to public worship or religious instruction. FC relies on *Calvary Baptist Church of Tilton v. Department of Revenue*, 349 Ill. App. 3d 325 (2004), where the court held that, in requiring that the property be used for public worship or religious instruction, the ALJ applied the wrong standard to determine the primary use of the property. *Calvary*, 349 Ill. App. 3d at 332. However, we do not read the ALJ's recommendation as equating "religious use" with public worship or religious instruction. The ALJ cited *Provena I*, where the court discussed *People ex rel. McCullough v. Deutsche Gemeinde*, 249 Ill. 132 (1911). In *McCullough*, our supreme court stated that "a religious purpose means a use of such property by a religious society or body of persons as a stated place for public worship, Sunday schools and religious instruction." *McCullough*, 249 Ill. at 136-37; accord *Provena I*, 384 Ill. App. 3d at 767. *Provena I* noted that our supreme court later held that the quoted passage from *McCullough* was not inclusive of everything that might in the future be regarded as a religious use but that it was illustrative of the nature of such use. *Provena I*, 384 Ill. App. 3d at 767. *Provena I* then held that medical care did not resemble public worship, Sunday schools, or religious instruction. *Provena I*, 384 Ill. App. 3d at 767. In citing *Provena I*'s discussion of *McCullough*, the ALJ was responding to FC's argument that "everything that occurs at [VL] is a religious activity." The ALJ concluded that "religious

identity, religious motivation, and religious spirit are not synonymous with, and are legally insufficient to establish, religious use." The ALJ's statement that FC finds constitutionally offensive was the following sentence: "Similarly, in the instant case, [FC] has failed to prove that leasing 320 residences to financially secure seniors 'resembles' public worship, Sunday school or religious instruction." The ALJ was simply using the same illustration as the court in *Provena I*, rather than limiting religious use to specific categories. Moreover, this argument is only a slightly different restatement of FC's other constitutional claim, which we have rejected, that it is the religious authorities who must determine whether the subject property is used exclusively for religious purposes.

¶ 22    Next, FC urges that VL is "an expression of the Church's healing ministry and mission" and that taxation "could eventually hamper, or lead to the silencing of, that expression." FC concludes that paying property taxes violates its right to free speech. FC does not flesh out its argument beyond this and cites inapposite cases' boilerplate language. Consequently, FC has forfeited this argument, because it is not clearly defined and sufficiently presented. See *Bublitz v. Wilkins Buick, Mazda, Suzuki, Inc.*, 377 Ill. App. 3d 781, 787 (2007).

¶ 23    In contending that VL was in fact exclusively used for religious purposes, FC argues that VL is part of the Church's mission of diaconal service,[3] VL directly furthers and fulfills the healing ministry of the Church, and VL allows the Sisters to fulfill their "unique charism" of healing and serving the aged and infirm. In their briefs, both sides rely on *Fairview*; however, at oral argument, FC attempted to distinguish *Fairview* on the facts.

¶ 24    In *Fairview*, Fairview Haven was a nursing home organized and supported by four Apostolic Christian Church of America congregations. *Fairview*, 153 Ill. App. 3d at 766. In support of its argument that it was entitled to a religious-use exemption, Fairview Haven cited the following facts: the Apostolic Christian Church of America founded Fairview Haven; there were needs in the community to care for the elderly in a nonwarehouse fashion and be a source of Christian atmosphere; one of the basic tenets of the church is that salvation is accomplished through faith and Christian witness; members show their faith by accomplishing Christian service works; Fairview Haven existed to meet the goal of accomplishing Christian service works; the motivating factor behind Fairview Haven was to provide an opportunity to help the elderly and fulfill the tenets of the church; and Fairview Haven was listed as an outreach ministry of the national church. *Fairview*, 153 Ill. App. 3d at 768. Testimony further showed that only church members could be on Fairview Haven's board; all policies, rules, and regulations had to subscribe to the beliefs of the church, and those beliefs had to be reflected in the operation of the nursing home; religious services were piped into the residents' rooms; the background music consisted of religious themes; Fairview Haven was an integral part of the church and was governed and maintained by the church; and Fairview Haven "proclaimed the good news," so it served a religious purpose. *Fairview*, 153 Ill. App. 3d at 768. The DOR denied the exemption and concluded that

---

[3]Theologian, Father Michael Place, testified that the service of "diakonia" is charitable works by which the Church seeks to bring healing where there is "brokenness of body, mind, or spirit."

Fairview Haven's use was primarily commercial, not religious or charitable. *Fairview*, 153 Ill. App. 3d at 769. The evidence showed that the residents paid fees at varying rates and signed admission contracts that contained guarantee-of-payment clauses. *Fairview*, 153 Ill. App. 3d at 766. On administrative review, the circuit court reversed the DOR's determination, and, with respect to religious use, the circuit court held that the DOR's finding that Fairview Haven was not used exclusively for religious purposes violated its first amendment rights. *Fairview*, 153 Ill. App. 3d at 769. The appellate court reversed the circuit court on the religious-use issue, holding that the DOR's determination that Fairview Haven's method of operation was businesslike, and therefore not exclusively for religious purposes, was supported by the evidence. *Fairview*, 153 Ill. App. 3d at 775. At oral argument, FC argued that the instant case is factually different from *Fairview* because, in *Fairview*, the operation of the nursing home was not a function of the church, whereas here, VL was the Church. FC's analysis is mistaken, because the evidence in *Fairview* showed that Fairview Haven was an outreach ministry of the national church.

¶ 25    The *Fairview* court set forth the parameters of constitutional religious-use inquiry in tax matters and held that, first, the court must accept the organization's characterization of the purposes of its activities, and, second, the court must determine whether the property is in fact used exclusively for religious purposes. *Fairview*, 153 Ill. App. 3d at 773.[4] Here, FC argues that, applying *Fairview*'s parameters, the evidence clearly showed that the Sisters "believe their activities are religious and use VL primarily for those religious activities." Specifically, FC points to the evidence that one of the missions of the Roman Catholic Church is to provide healing to those in need, and VL, as part of the Church, fulfills that mission by providing care to older adults in need. FC maintains that the provision of shelter and care for the aged is a tenet derived from scripture and is a form of worship. The DOR and the school district cite *Fairview* for the proposition that, where a nursing home is operated as a commercial concern, it is not used exclusively for religious purposes. In sum, FC focuses on the Sisters' religious beliefs while the DOR and the school district grant the existence of those beliefs but focus on the actual nuts-and-bolts operation of VL.

¶ 26    In *Fairview*, the court acknowledged (and it was uncontested) that the operation of Fairview Haven "provided an opportunity for members of the Apostolic Christian faith to carry out Christian service work, care for the elderly, and engage in evangelization." *Fairview*, 153 Ill. App. 3d at 774. The court then stated, "However, operation of the nursing home was not necessary for these religious purposes, which could also have been accomplished through other means." *Fairview*, 153 Ill. App. 3d at 774. The court noted that the practice of virtues is encouraged by all religious organizations, but the practice of such virtues as charity and kindness, in particular toward the aged, is not within commonly accepted definitions of "religious purposes." *Fairview*, 153 Ill. App. 3d at 774. Here, the ALJ, citing this language from *Fairview*, concluded: "Similarly, whereas the existence and

[4]FC consistently acknowledges the first prong of the *Fairview* constitutional analysis–that the court must accept the organization's characterization of the purposes of its activities–but also consistently disagrees with the second prong, that is, that the court determines whether the subject property is, in fact, used exclusively for religious purposes.

operation of VL may provide an opportunity for religious activities, VL, itself, is not necessary for the fulfillment of the Sisters' mission, and [VL] is not necessary for the performance of religious activities, mandated by the Church in order to attain salvation." FC argues that the ALJ's conclusion was clearly and constitutionally erroneous, given the Sisters' charism.

¶ 27    In *Fairview*, the existence of Fairview Haven provided church members the opportunity to accomplish "Christian service works." *Fairview*, 153 Ill. App. 3d at 768. "Christian service works" is a broad category, lending meaning to the court's statement that operating Fairview Haven was not necessary to the fulfillment of the goal of accomplishing "Christian service works," as other "works" could take its place and still meet the goal. Here, Sister Diane Marie Collins, the Sisters' general minister, testified that the charism is the spirit that impels the performance of a particular apostolate. Sister Diane Marie testified that the charism of the Sisters comes from their foundress whose mission was to care for the elderly. Therefore, according to Sister Diane Marie, the Sisters' charism is "to meet the needs of the elderly men, women[,] and children [*sic*], and to do so to the best of our ability." Sister Diane Marie testified that the Sisters implement their charism through their institutions of service such as VL. Thus, the Sisters' charism is much narrower than "Christian service works," as "Christian service works" is generic, while meeting the needs of the elderly is more specific. Still, meeting the needs of the elderly is broader than the operation of VL, as meeting the needs of the elderly could presumably be accomplished in any number of ways. This is how we interpret the ALJ's conclusion. At oral argument, FC asserted that its operation of VL as a CCRC was necessary to meet the Sisters' charism.[5] However, FC also acknowledged at oral argument that the Sisters' operation of CCRCs, as a means of fulfilling their 114-year charism, is relatively new, as FC began operating CCRCs only in the 1980s.

¶ 28    The discussion of how the Sisters accomplish their goals is misleading because, whether we are talking about meeting the goal of "Christian service works" or implementing the Sisters' charism, we are talking about the motivation for operating the subject property as a nursing home. "Religious purpose is not determined solely by the professed motives or beliefs of the property owner." *Provena II*, 236 Ill. 2d at 409. Courts must look at the "facts and circumstances regarding how the property is actually used."[6] *Provena II*, 236 Ill. 2d at 409. Again, the parties in our case look at how VL is actually used through different lenses. Sister Diane Marie testified:

    "The way in which we witness to the Church is by the service that we give and what

---

[5]At oral argument, FC attempted to distinguish *Provena II* on this basis, noting that the court in *Provena II* pointed out that the taxpayer there made no claim that operation of a fee-based medical center was essential to the practice or observance of the Catholic faith. See *Provena II*, 236 Ill. 2d at 410.

[6]It is well to keep in mind that there is a distinction between religious purpose and religious use. The record is clear that everything the Sisters do with respect to VL is done with a religious purpose, *i.e.*, motivation, whereas the use to which the property is put stresses the practicality of the result.

-10-

I mean [by] that is the service that we give to the residents [of VL]. The service that we give to our associates who other persons would call employees. What I mean by service here is the fact that we–everything that we do, everything that is done in any of our CCRCs or any of our other ministries or apostolates is considered religious service, because that is what we're required to do."

Sister Diane Marie explained that "from the way a floor is mopped, toilet is cleaned, resident is fed, families are dealt with, all of those things for us are some of the examples of the ways that we witness to the Church." The DOR and the school district dwell on the commercial aspects of VL. As the appellate court in *Provena I* stated, "The issue is not whether [the hospital] is operated as an 'apostolic mission and health care ministry of the Catholic Church' but whether it is 'used exclusively for *** religious purposes' as case law defines that phrase." *Provena I*, 384 Ill. App. 3d at 766. Here, also, the issue is not the religious motivation behind the day-to-day use of the subject property, but the day-to-day use itself.

¶ 29    In determining that a day care center run by a religious organization was not exempt, the court in *Faith Builders Church, Inc. v. Department of Revenue*, 378 Ill. App. 3d 1037 (2008), said, "In a sense, everything a deeply devout person does has a religious purpose. But if that formulation determined the exemption from property taxes, religious identity would effectively be the sole criterion." *Faith Builders*, 378 Ill. App. 3d at 1046. "Exemption would be the rule, and taxation the exception." *Provena I*, 384 Ill. App. 3d at 766. For purposes of taxation, courts look at whether advancing religion is identified as the subject property's dominant purpose. *Provena II*, 236 Ill. 2d at 409. Courts also look at whether the operation is more businesslike and characteristic of a commercial enterprise than a facility used primarily for religious purposes. *Faith Builders*, 378 Ill. App. 3d at 1046. Here, FC had to prove that the religious use of VL was primary and that any secular use was incidental. See *Provena I*, 384 Ill. App. 3d at 767.

¶ 30    According to VL advertisements in evidence, VL offers a "gracious atmosphere in which to enjoy family and friends. Residents enjoy carefree living in a warm and inviting community." Billing life at VL as a "lifestyle of choice," VL advanced the "top ten" reasons to move to garden and apartment homes: (1) "You can sell that lawn mower and snow shovel!"; (2) "You can turn your green thumb loose!"; (3) "A feeling of safety and security!"; (4) Lots of activities you can enjoy!"; (5) "Wonderful dining experiences!"; (6) "You can ride the Village bus!"; (7) "You have no home maintenance!"; (8) "It's an ideal setting!"; (9) "Healthy connections!"; and (10) "PEACE OF MIND!" VL's brochure invited residents in the garden homes and apartments to "choose [their] fun": "It's all right here for you. Taking part in daily planned activities, attending social functions, going to theatrical, cultural and recreational events ***." VL listed the amenities available to residents: arts and crafts room; atrium; bank; beauty salon/barber shop; computer center; country store/café; elegant dining room; garages; gazebo; health and fitness center; library; multipurpose great room; private dining room; spacious common lobby areas; walking paths; and beautifully landscaped grounds. Amenities for the assisted living residents included a tea kitchen, lounge spaces, television connections, and a common fireplace outside the country dining area. The Alzheimer's unit featured "Sunshine Wings" to "accommodate residents in a comfortable and home-like atmosphere." The continuing care center was billed as a "place that feels like

home"; "a place where you feel connected"; "a place where you feel loved"; "a place where you can grow spiritually"; "a place where you can age with choice"; "a place where you will experience quality service . . . everyday"; "a place where you are surrounded by natural beauty"; and "a place where you have access to superior health care . . . on site."

¶ 31    Documents in evidence showed that FSCSC analyzed whether FC should purchase VL in light of market and financial criteria. Documents in evidence also revealed that VL was a good acquisition based on "location/market area," but that to achieve a "break-even position," both "marketing efforts and monthly rates will need to increase." After FC acquired VL, it reduced expenses at VL through staff reductions. FC's documents showed that it closely monitored local markets to ensure that competitive rates were being charged. Residents signed contracts, and VL was authorized to terminate residency for nonpayment or bankruptcy. In 2007, VL generated $17.4 million in gross revenue from fees paid by residents.

¶ 32    The school district included in its separate appendix documents that are not part of the record. Those documents are pages of a loan agreement between FC and the Illinois Finance Authority in which FC agreed to "use [VL] primarily as and for senior living and health care facilities and related activities and only in furtherance of the lawful corporate purposes of [FC]." FC further agreed that it would not use VL in a manner that is prohibited by the first amendment. The school district and the DOR contend that these documents contradict FC's religious-use arguments and they ask us to take judicial notice of the documents. "Courts cannot consider evidence outside of the record of the administrative appeal." *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004). Consequently, we will not judicially notice, nor will we consider, the documents in the school district's appendix.

¶ 33    We turn now to FC's denial that VL was operated with a view to profit. FC argues that, because VL lost money and because the Sisters "believe their mission is important and want to continue it for another 114 years," VL was not operated with a view to profit. The legislature did not premise the religious-use exemption on whether an entity actually realizes a profit but on whether the entity uses the property "with a view to profit." Consequently, realizing a loss does not establish FC's lack of intent to make a profit, and the Sisters' desire to continue to serve the elderly for an extended period of time is irrelevant to whether VL was operated with a view to profit. With respect to the argument that the Sisters use any monies they make from the operation of VL to continue their mission, the fact that property is used with a view to profit defeats a religious-use exemption regardless of whether that profit is applied to maintaining the religious organization. *Three Angels*, 381 Ill. App. 3d at 697. FC's reliance on *Inter-Varsity Christian Fellowship of the United States of America v. Hoffman*, 62 Ill. App. 3d 798 (1978), is misplaced. In *Hoffman*, the religious organization's sale of publications did not defeat the religious-use exemption. *Hoffman*, 62 Ill. App. 3d at 803. *Hoffman* is inapposite for two reasons. First, the court in *Hoffman* held that the law developed in cases involving homes for the elderly was not applicable. *Hoffman*, 62 Ill. App. 3d at 801. Second, the facts in *Hoffman* are distinguishable. The evidence in *Hoffman* showed that any revenue in excess of expenditures was the sole result of donations; the organization sold its publications at cost or less; and the organization provided a substantial

amount of its materials free or below cost to groups that were targeted for its message. *Hoffman*, 62 Ill. App. 3d at 803. Here, VL did not provide any services for free,[7] and the majority of its revenue was derived from the fees it charged its residents. Even if VL lost money as a business enterprise, the evidence does not support the theory that the loss was intentional. Indeed, FC's argument is that the Sisters were required by canon law to be good stewards and make money so that their mission could continue into the future.

¶ 34    FC's reliance on *Calvary* is also misplaced. The appellate court in *Calvary* reversed the DOR's determination that the subject property was not exempt, based in part on the fact that the ALJ applied the wrong legal standard. *Calvary*, 349 Ill. App. 3d at 332. The evidence in *Calvary* demonstrated that use of the subject property was limited to the religious organization's members, their friends, and other churches, and that secular activities were only occasional. *Calvary*, 349 Ill. App. 3d at 333. In our case, none of the Sisters resided at VL, and VL's director and staff were laypeople, not even necessarily Catholics. The vice-president and the director of mission integration and pastoral care were both laypersons. The residents were laypersons of any faith or no faith. VL offered its residents many amenities and activities that were unrelated to religion.

¶ 35    The evidence supports the conclusion that, except for the chapel, which was used exclusively for religious purposes, the primary use of VL was for upscale senior housing and care with an enhanced lifestyle. To be sure, there was a religious component, but–as the advertisements and enticements for living at VL make clear–advancing religion was not VL's primary purpose.

¶ 36    We understand and appreciate FC's argument that the Sisters' primary purpose was religious, in the sense that their motivation was religious, but the issue is not whether VL was an apostolate of the Sisters. It unquestionably was. FC insistently frames the issue in terms of the Sisters' religious beliefs and values: "[T]he manifest weight of the evidence shows that the Sisters believe their activities at VL are religious and that they use VL for those religious purposes." No one–not the DOR, the school district, or the ALJ–questioned the Sisters' beliefs. For that reason, FC's reliance on cases such as *University of Great Falls v. National Labor Relations Board*, 278 F.3d 1335 (D.C. Cir. 2002), and *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (dealing with the line between religious and secular activities), is unavailing. Here, we are not called upon to decide whether the Sisters engage in religious activities. It is a given that they do, but the evidence overwhelmingly showed that the operation of VL was businesslike and characteristic of a commercial enterprise. VL was not *giving* care to the elderly; it was *selling* care to the elderly, as well as a certain lifestyle for those in independent living, at competitive market rates. The DOR's determination that VL was operated with a view to profit was not clearly erroneous. Consequently, even if FC had proved that the use of the subject property was exclusively for religious purposes, it could not avail itself in 2007 of a religious-use tax exemption.

---

[7]In 2007, VL had empty accommodations yet did not house elderly in need who could not afford the entrance fees and monthly service packages.

-13-

¶ 37                              2. FC's Charitable Exemption Claim

¶ 38        We turn now to FC's contention that it was entitled to a charitable tax exemption for the year 2007. The findings and conclusions of an administrative agency on questions of fact are considered *prima facie* true and correct, and we may not interfere with the agency's discretionary authority unless it is exercised in an arbitrary or capricious manner or the administrative decision is against the manifest weight of the evidence. *Gumma v. White*, 345 Ill. App. 3d 610, 615 (2003). The appellate court may not reverse the agency's decision simply because it would have ruled differently or because the opposite conclusion is reasonable. *Boom Town Saloon, Inc. v. City of Chicago*, 384 Ill. App. 3d 27, 32 (2008). "If there is any evidence in the record that fairly supports the agency's decision, then the decision is not against the manifest weight and the decision must be affirmed on appeal." *Boom Town*, 384 Ill. App. 3d at 32.

¶ 39        In *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149 (1968), our supreme court set forth six criteria or guidelines for determining whether property is exclusively used for charitable purposes:[8] (1) the charitable institution bestows benefits upon an indefinite number of persons, reducing the burdens of government; (2) the charitable institution has no capital, capital stock or shareholders, and earns no profits or dividends; (3) the institution's funds are derived mainly from private and public charity and are held in trust for the purposes expressed in the charter; (4) charity is dispensed to all who need it and apply for it; (5) the institution puts no obstacles in the way of those seeking the charitable benefits; and (6) the primary use of the property is for charitable purposes. *Korzen*, 39 Ill. 2d at 156-57; *Provena I*, 384 Ill. App. 3d at 742. Here, the ALJ found that FC failed to satisfy all six of the *Korzen* factors.[9]

¶ 40        FC contends that the ALJ erred by limiting "charity" to almsgiving or "giving money away." FC argues that charity includes relieving suffering and attending to persons' spiritual and physical well-being. For the Church, FC explains, *diakonia* (a Greek word meaning service or charity) "is to bring love and remedy wherever there is brokenness." In the property-tax arena, our supreme court has not so broadly defined charity or, more particularly, charitable use. The legislature, which has the power to tax, also has the power to exempt from taxation. *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 285 (2004). The legislature has determined (consistent with the Illinois Constitution) that the exemption is limited to property that is exclusively used for charitable purposes, and

_____

[8]The court explained that the statutory term "exclusively used" means the "primary purpose for which the property is used and not any secondary or incidental purpose." *Korzen*, 39 Ill. 2d at 157.

[9]The DOR and the school district–especially the DOR–base their charitable-exemption arguments largely on *Provena II*'s charitable-use analysis, which, as Justice Burke noted in her partial dissent, is not binding on lower courts under the doctrine of *stare decisis*. *Provena II*, 236 Ill. 2d at 416-17 (Burke, J., concurring in part and dissenting in part, joined by Freeman, J.). Therefore, our analysis is pre-*Provena II*.

-14-

our supreme court in *Korzen* articulated the guidelines for resolving the question of charitable use. *Eden*, 213 Ill. 2d at 287. The ALJ employed the guidelines. Consequently, the ALJ's approach was not impermissibly narrow.

¶ 41 In applying the *Korzen* factors, we are mindful that the factors are guidelines, not strict requirements, that courts consider and balance by examining the facts of each case. *Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 469 (1995). Here, the ALJ analyzed the factors in a different order from that outlined in *Korzen*, so, for consistency, we will employ the ALJ's blueprint.

¶ 42 ### A. The Organization's Funds Are Derived Mainly
### From Private and Public Charity

¶ 43 The ALJ found that FC failed to prove that VL's funds were derived mainly from private and public charity and held in trust for the objects and purposes expressed in its charter. The evidence showed that VL derived its operating income almost exclusively from residents' fees. In 2007, resident revenue was $15.6 million, and total operating revenue was $15.7 million. Further, there was testimony that VL received almost no donations or gifts in 2007. Ken Wiberg, the community controller in 2007, testified that donations to VL in 2007 were "maybe" $1,000. FC maintains that the Sisters gave money to VL, but there was no documentation showing transfers of money from FC to VL in 2007.

¶ 44 In *Wyndemere Retirement Community v. Department of Revenue*, 274 Ill. App. 3d 455 (1995), Wyndemere, a "life-care community for the elderly," sought a charitable-use exemption from retailer's occupation taxes and use taxes. *Wyndemere*, 274 Ill. App. 3d at 456. In affirming the Department's denial of the exemption, this court examined the *Korzen* factors. With respect to how Wyndemere derived its funds, the evidence showed that its initial construction funds were provided by a charitable organization but that the balance of its funds for operation were provided by "substantial" entrance and monthly fees charged "to those who can afford to avail themselves of Wyndemere's services." *Wyndemere*, 274 Ill. App. 3d at 460. In *Alivio Medical Center v. Department of Revenue*, 299 Ill. App. 3d 647 (1998), 59% of the medical center's income was derived from patient fees, which militated against its claimed charitable status. *Alivio*, 299 Ill. App. 3d at 651-52. Here, the percentage of VL's income from residents' fees was much higher, nearly 100%. The present case fits within the holdings of *Wyndemere* and *Alivio*, which followed our supreme court's precedent in *Small v. Pangle*, 60 Ill. 2d 510 (1975), where the court held that an old people's home was not entitled to a charitable exemption, in part because its "greatest source of funds [was] not from either private or public charity" but from monthly resident rental charges. *Small*, 60 Ill. 2d at 517.

¶ 45 ### B. The Organization Has No Capital, Capital Stock
### or Shareholders and Does Not Provide Gain

¶ 46 While the ALJ acknowledged that FC had no capital stock or shareholders, he concluded that this factor weighed in favor of taxation, because FC purchased and operated VL with a

view to profit, there was no evidence that VL's highest-compensated employees were paid salaries commensurate with other nonprofits, and VL paid substantial management fees to FC. Thus, the ALJ concluded that FC provided gain or profit in a private sense to persons connected with it. See *Korzen*, 39 Ill. 2d at 157 ("[A] charitable institution is one which *** does not provide gain or profit in a private sense to any person connected with it."). FC contends that the ALJ's conclusion was against the manifest weight of the evidence, arguing that VL actually lost money, the money it took in from residents' fees was used to maximize FC's charity, testimony that VL's salaries were in the range of other nonprofits was unrebutted, and any management fees VL might have paid to FC were used to further the Sisters' charitable mission. The evidence supported the ALJ's finding that FC purchased and operated VL with a view to profit. Documents in evidence made it clear that market considerations went into the decision to purchase VL and that, upon purchase, rates were increased in an effort to achieve a "break-even" position. FC thereafter was concerned about maintaining competitive market rates. That VL did not actually turn a profit is not the criterion for determining whether it is eligible for a charitable exemption. The legislature provided that an entity is ineligible for the exemption where it is used with a view to profit, not where it *makes* a profit. Nor are we persuaded by FC's argument that it would have used any gains to further the Sisters' mission. It is the use to which the property is put, rather than the use to which income from the property is put, that is decisive. *Salvation Army v. Department of Revenue*, 170 Ill. App. 3d 336, 344 (1988).

¶ 47    FC presented testimony that VL determined compensation for its executives and employees in 2007 by comparing salaries to something called the "Mercer Study," a research tool for institutions comparable to FC. Although FC's witnesses testified that executive salaries fell within the "Mercer range," or fell below market rates, FC did not introduce the study itself into evidence, leaving the ALJ unable to conclude that VL did not provide gain or profit in a private sense to persons connected with it. The absence of evidence regarding reasonable salaries weighs in favor of taxation. *Arts Club of Chicago v. Department of Revenue*, 334 Ill. App. 3d 235, 246 (2002). FC argues that it presented testimony that the ALJ was bound to accept, because it was unrebutted. FC ignores that the trier of fact is always free to disbelieve any witness. See *Sorenson v. Industrial Comm'n*, 281 Ill. App. 3d 373, 384 (1996).

¶ 48    With respect to management fees VL paid to FC, the ALJ found that the testimony was confusing and contradictory and, therefore, must be construed against FC and in favor of taxation. Sister Diane Marie testified that there were no management fees, but Wiberg, the community controller, testified that there were "substantial" management fees. The ALJ likened any management fees to those paid by a condominium association to a property manager. The DOR concedes that any management fees that VL might have paid to FC would not favor taxation, because contracts with third-party vendors are a reality of modern-day life. We do not think that the issue of management fees is dispositive of whether VL provided private gain to anyone associated with it, because the evidence was overwhelming that VL was operated with a view to profit and was, therefore, not entitled to a charitable-use exemption. *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498 (2004), upon which FC relies, is inapposite, because the issue in *Quad Cities* was not exemption but whether an

enabling statute applied to charitable organizations that operate an athletic event with the specific purpose of promoting the common good and general welfare. *Quad Cities*, 208 Ill. 2d at 507.

¶ 49                     C. The Benefits Derived Are for an Indefinite Number of Persons

¶ 50    The ALJ found that the testimony and documentary evidence offered at the hearing showed "conclusively" that VL charged substantial entrance and "up-front" fees for the independent living units, assisted care units, and continuing care center in 2007. This finding was not against the manifest weight of the evidence. For the independent living garden homes, VL required residents to pay a 90% refundable entrance fee, which ranged from $244,186 to $332,608. Residents in independent living apartments paid a 90% refundable entrance fee–ranging from $127,596 to $252,525–depending on the square footage. Monthly fees for assisted living were from $3,881.36 up to $4,741.16, depending on the style of the unit, and two months' fees were due in advance. The continuing care center charged daily fees up to $197 plus extra fees for certain services and amenities. VL did not waive or reduce the entrance fees for any resident in 2007. FC contends that VL bestowed its benefits upon an indefinite number of persons, because it did not restrict admission to Catholics or deny persons admission based upon race or other invidious criteria. This misses the point. The requirement of a sizeable entrance fee cannot be reconciled with the requirement that benefits be applied to an indefinite number of people. *Small*, 60 Ill. 2d at 516.

¶ 51    Courts have been consistent in denying exemptions where institutions charge substantial entrance fees. In *Eden*, our supreme court held that substantial entrance fees and monthly maintenance fees placed obstacles in the way of those seeking the benefits of Eden's independent living units. *Eden*, 213 Ill. 2d at 293-94. In *People ex rel. Nordlund v. Association of the Winnebago Home for the Aged*, 40 Ill. 2d 91 (1968), the corporation operating the home claimed that the property was exclusively used for charitable and beneficent purposes and was, therefore, exempt from taxation. *Nordlund*, 40 Ill. 2d at 92. Our supreme court disagreed, saying, "[The home's] insistence upon the payment of a sizeable admission fee, the assignment by a resident of his assets and the health requirements imposed, constitute [a] *** serious impediment to the tax exempt status it seeks." *Nordlund*, 40 Ill. 2d at 101. In *Good Samaritan Home of Quincy v. Department of Revenue*, 130 Ill. App. 3d 1036 (1985), the home was denied an exemption where the residents were required to pay a substantial amount of "prepaid rent." *Good Samaritan*, 130 Ill. App. 3d at 1041. In *Plymouth Place, Inc. v. Tully*, 54 Ill. App. 3d 657 (1977), in denying an exemption, the court took into consideration, in addition to the entrance fees charged, that an applicant had to be in good physical and mental health for his or her age and of good moral character and that residents paid more for larger suites. *Plymouth*, 54 Ill. App. 3d at 658. In denying a charitable exemption, this court has also taken into consideration the fact that charges vary based on the size of the unit. *Wyndemere*, 274 Ill. App. 3d at 460.

¶ 52    Here, VL required hefty entrance fees and monthly charges, which varied according to the size of the home, apartment, or unit. VL also screened independent living applicants for physical and mental health. Likewise, the absence of a legal obligation to keep and maintain

-17-

any person who becomes unable to fulfill his or her financial obligation or otherwise becomes sick or unmanageable is inconsistent with a charitable purpose. *Small*, 60 Ill. 2d at 516. VL's residency agreements for the independent living units stated that VL could terminate residency for certain medical conditions or when the resident filed for bankruptcy protection or was otherwise unable to meet his or her financial obligations to VL. We conclude, like the court in *Plymouth*, that VL's purpose and function was not primarily charitable, but rather was designed "to cater to those persons who [could] pay for the services rendered." *Plymouth*, 54 Ill. App. 3d at 659.

¶ 53                       D. Charity Is Dispensed to All Who Need and Apply for It

¶ 54       The ALJ analyzed what charity VL provided in 2007. FC characterized VL's "contractual allowances" as charitable. A contractual allowance was the difference between what VL's charges were and what payments it accepted. For instance, FC claimed that it gave market discounts consisting of accepting less than market rates for the independent living units and that it absorbed unreimbursed costs of Medicare. However, the record showed that, in some cases, residents paid room and board charges that were higher than the market rate, and Medicare discounts are not charity (*Riverside Medical Center v. Department of Revenue*, 342 Ill. App. 3d 603, 610 (2003)).

¶ 55       FC included the "Gift of Care" program in its contractual allowances. The record showed that FC provided a "Gift of Care" program for new and existing residents after they exhausted all other resources. A "Gift of Care" was subject to the financial resources available at VL and could be withdrawn if VL's financial resources became depleted. Residents were required to spend down their assets before being considered for a "Gift of Care," and residents who received a "Gift of Care" could be asked to downsize their living arrangements. Financial assistance rejection letters included language stating that the resident would have to leave VL if financial assistance funds were unavailable. Documents in evidence showed that not everyone who applied for a "Gift of Care" in 2007 was accepted into the program. In 2007, the total amount of "Gift of Care" assistance for the continuing care and assisted living units was $520,294 (contrasted with resident revenue of $15.6 million). Moreover, those who qualified for a "Gift of Care" were required to repay the assistance from the 90% refundable entrance fee either upon leaving VL or upon death.

¶ 56       Under *Wyndemere*, the "Gift of Care" program was not charity, because, rather than dispense the assistance to all who needed it, VL conditioned a "Gift of Care" on VL's own financial circumstances, and because the number of persons receiving assistance was minimal. See *Wyndemere*, 274 Ill. App. 3d at 460. "Charging fees and rendering benefits to persons not poverty-stricken does not destroy the charitable nature of an organization, but this is true only to the extent that the organization admits persons who need and seek the benefits offered but are unable to pay." *Wyndemere*, 274 Ill. App. 3d at 460. In our case, the evidence showed that VL was at 75% capacity in 2007, yet it did not take in anyone who was unable to pay. A gift is a transfer of property by one to another "without any consideration or compensation therefor." *In re Estate of Berbecker*, 277 Ill. App. 201, 205 (1934). Here, VL was selling care to those who could afford it, and, as in *Wyndemere*, VL's primary

purpose was not to provide charity, but to "provide a certain enhanced lifestyle to the elderly who can afford to pay for it." *Wyndemere*, 274 Ill. App. 3d at 461.

¶ 57                    E. The Organization Does Not Appear to Place Obstacles

¶ 58    The ALJ concluded that VL placed obstacles in the way of those who needed and would have availed themselves of charity, because VL's brochure did not state the availability of the "Gift of Care" program, nor did the general public know of the program's existence. Further, the ALJ concluded that, because a "Gift of Care" was dependent upon VL's financial resources, there was no guarantee of its availability, making it speculative. The record supports the ALJ's conclusions. Moreover, the sizeable entrance fees and the requirement that residents repay the "Gift of Care" are obstacles. See *Small*, 60 Ill. 2d at 516.

¶ 59                    F. The Exclusive Use of the Property Is for Charitable Purposes

¶ 60    The term "exclusively used" means the primary purpose for which the property is used and not any secondary or incidental purpose. *Nordlund*, 40 Ill. 2d at 101. In 2007, even assuming that the "Gift of Care" program was charity, VL dispensed such charity to 12 persons. VL did not admit anyone who could not pay the substantial entrance fees and monthly assessments. VL's contracts provided for the termination of residency in the event of bankruptcy or nonpayment. In sum, the record showed that VL was purchased and operated with a view to profit, and its primary purpose was to house and serve upscale seniors. Applying the *Korzen* factors to the instant facts, all six factors weigh in favor of taxation.

¶ 61                                3. FC's Due Process Argument

¶ 62    FC's final contention is that this court should reverse on the basis that the ALJ "evidenced a deep-seated antagonism against FC and a predisposition" in favor of the DOR and the school district so that FC's due process rights were infringed. Fundamental principles and requirements of due process govern administrative hearings. *Williams v. Board of Trustees of the Morton Grove Firefighters' Pension Fund*, 398 Ill. App. 3d 680, 691 (2010). On administrative review, the court examines the procedures employed at the administrative hearing to determine whether they were fair and impartial. *Williams*, 398 Ill. App. 3d at 691. Due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand. *Williams*, 398 Ill. App. 3d at 691. In an administrative proceeding, due process does not require a full judicial proceeding. *Williams*, 398 Ill. App. 3d at 691. A fair hearing before an administrative agency includes the right to cross-examine adverse witnesses and impartial rulings on the evidence. *Williams*, 398 Ill. App. 3d at 692.

¶ 63    The DOR claims that FC has forfeited this issue by not citing to pages of the record where such antagonism and predisposition were manifested. FC provided record citations in its statement of facts but not in the argument section of its opening brief. While FC should have included record citations in its argument (*Scoggin v. Rochelle Community Hospital*, 176

Ill. App. 3d 648, 650 (1988)), we choose to overlook the violation and address the issue.

¶ 64     FC argues that the ALJ cut short its counsel's opening statement and limited much of its planned evidence, thus preventing FC from making an adequate record. This assertion is without merit. When counsel was 50 minutes into his opening statement and had not yet touched upon the issue to be tried–the use to which VL was put in 2007–the ALJ interrupted and gave counsel 10 minutes more to complete his opening statement. Arguing with the ALJ, counsel stated that he would take 15 minutes. Much of the testimony FC presented was repetitious and irrelevant.[10] Despite the DOR's and the school district's repeated stipulations that the Church and the Sisters were religious organizations, FC presented evidence of Church history and doctrine from its founding. Counsel quarreled with the ALJ over almost every adverse evidentiary ruling or simply ignored the ALJ's rulings. The ALJ had set aside certain days to accommodate the hearing, yet FC presented witnesses for direct examination who were then unavailable for cross-examination.[11] The ALJ allowed FC additional days beyond those he originally scheduled, and he allowed FC to make written offers of proof. The ALJ had the discretion to control the hearing in the best manner under the circumstances. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 825 (2009). In some 8,000 pages, FC advanced its theory that VL was the Church, and counsel have ably argued the theory on appeal. We have not found the record wanting in any respect. FC has not shown any prejudice in the proceeding, and without a showing of prejudice a claimed due process violation will not be sustained. *Sudzus*, 393 Ill. App. 3d at 825. Further, the voluminous record does not support FC's assertion that the ALJ was biased against Catholicism. Accordingly, the administrative proceeding did not deny FC's due process rights.

¶ 65                              III. CONCLUSION

¶ 66     For the foregoing reasons, we affirm the judgment of the circuit court of Lake County, which upheld the DOR's decision to deny FC's request for a property tax exemption, except for the chapel.

¶ 67     Affirmed.

---

[10]A history of the Ursulines' mission to New Orleans in 1727 and their establishment of an herb garden was not relevant, as one example.

[11]This was not entirely within counsel's control. For instance, Father Place's mother was ill in the hospital, and Father Place was called to her bedside to administer last rites.