LEN H. SMALL *et al.*, Trustees, Appellees, v. CHARLES L. PANGLE, County Treasurer, *et al.*, Appellants.

*Opinion filed March 24, 1975.—Rehearing denied May 29, 1975.*

RYAN, J., took no part.

John Bernard Cashion and Paul F. Davidson, of Chicago, for appellants.

William E. Eaken, of Kankakee, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court:

The plaintiffs brought this action in the circuit court of Kankakee County to enjoin the county officials from levying, assessing and collecting real estate taxes on certain property used in the operation of an old people's home. The trial court granted summary judgment to the plaintiffs. The appellate court affirmed, holding that the real estate in question was exempt from taxation. (*Small v. Nelson* (1974), 17 Ill. App. 3d 1082.) We granted leave to appeal.

The basic issue presented is whether the property is exempt from taxation under section 6 of article IX of the 1970 Illinois Constitution and under the provisions of section 19.7 of the Revenue Act of 1939, as amended,

which implements the constitutional provision. Ill. Rev. Stat. 1971, ch. 120, par. 500.7.

The plaintiffs are trustees of a charitable trust. The trust owns and operates an old people's home called the Heritage House, which was constructed in 1970. Its value was set at about $1,155,000. Initial furnishing costs totaled approximately $100,000. Roughly $850,000 of the initial construction and furnishing costs were provided from the trust fund. The balance of the funds came from a first mortgage in the amount of $400,000. Since then additional junior mortgages, totaling $160,000 have been taken out, and a total of approximately $40,000 has been paid off against all of the mortgages.

As of the end of 1972, the trust for the operation of the Heritage House had $57,000 in current assets and $1,342,000 in property and equipment, after depreciation. Liabilities totaled $631,000. The operating income for the year 1972 totaled $465,000 and the operating expenses were $432,000.

There are 68 rooms in the Heritage House. Fifty-two rooms are provided for "residents" who are retired persons. Sixteen rooms are provided for "nursing residents," who require nursing care.

During 1972 the charges to "residents" ranged from $325 per month for an unfurnished semi-private one-room apartment to $615 per month for a furnished two-room private apartment. The charges to "nursing residents" varied from $560 per month to $975 per month. These charges included meals but excluded medication, certain nursing supplies, and other personal items. The average charge to an ambulatory resident totaled $425.36 per month, and the average charge to a nursing resident totaled $680.31.

The Heritage House is self-sustaining. There is an admissions committee, but the requirements of admission are not disclosed by the records. It appears, however, that the residents must meet health requirements, and they

must be able to make the monthly payment requirements. None of the patients is a public charge or in any special category of old-age or nursing assistance insofar as government funding is concerned. The situation has never arisen where a person who has applied for admission has been unable to make the monthly payments. Two families did move out because of the rate.

The agreement for residency is entered into between the trustees of the trust, the applicant, and a "responsible party." The latter may be either the applicant or a third party who agrees to pay the monthly and other charges imposed. At the inception of the agreement, such party must pay the first month's payment in advance and a deposit equal to two months' charges. The agreement provides that admission to the Heritage House will be on a nonsectarian basis, without distinction because of race, color or creed. It also provides that the management has the right to refuse admission or to discharge a resident without giving any reason or cause.

Section 19.7 of the Revenue Act of 1939, as amended, provides, in part:

> "All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or any other state of the United States, and all property of old people's homes, when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit; and all free public libraries. The words 'old peoples homes' as used in this section shall include any old peoples home licensed by the State of Illinois and owned by a not-for-profit corporation or organization and operated not for profit under the auspices of a religious, fraternal, charitable or other non-profit organization which old peoples' home provides housing, meals, laundry and infirmary services to aged persons and which is financed wholly or in part by charges made to its residents or wholly or in part by endowment, gifts or bequests or by a combination of the foregoing. This definition shall be construed as declaratory of the existing law and not as a new enactment. No

hospital, however, which has been adjudicated by a court of competent jurisdiction to have denied admission to any person because of race, color or creed shall be exempt from taxation." Ill. Rev. Stat. 1971, ch. 120, par. 500.7.

The right of the legislature to exempt real property from taxation arises under section 6 of article IX of the Illinois Constitution of 1970. This provides:

"The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes. The General Assembly by law may grant homestead exemptions or rent credits."

The above is clearly nothing more than a rephrasing of a similar provision contained in section 3 of article IX of the Illinois Constitution of 1870. Those cases interpreting the permissive legislative exemptions under the Constitution of 1870 are equally relevant to the limits of exemption now constitutionally permitted.

The basic premise, that statutes providing exemption from taxation shall be strictly construed because article IX of the Constitution subjects all property to taxation (see *Wesley Willows v. Munson* (1969), 43 Ill.2d 203, 207), remains valid. Also see *People ex rel. Nordlund v. Winnebago Home for the Aged* (1968), 40 Ill.2d 91.

Three recent cases are dispositive of the issues presented in this case. In *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill.2d 149, this court was presented with the identical basic issue. In *Korzen,* among other factors, applicants to the old people's home were required to submit detailed statements of their health, financial condition and personal history. They also were required to pay an entrance fee and monthly service charge, both of which were based upon the size and location of the quarters to which they were to be assigned. While the entrance fee varied from $6,000 to $25,000, the monthly charge ranged from $175 to $375. Nearly all of the funds

were provided from the entrance and monthly service fees. The home was not required to continue to provide care and shelter for any resident who became unmanageable because of illness or unable to meet his monthly charge. Likewise there was no requirement to admit applicants who were unable to meet the typical charges imposed. It was not disputed that the plaintiff, a not-for-profit corporation, was operating a not-for-profit old people's home licensed by the State of Illinois under the auspices of a religious organization.

We observed, in *Korzen,* that while this appears to fit the definition of "old people's home" as used in the statute, the statute could be no broader than permitted by the Constitution. The statute could not declare such property as being used exclusively for charitable purposes. It is the province of the court to make that determination. (39 Ill.2d 149, 155-156.) We thus concluded that section 19.7 of the Revenue Act of 1939 did not intend to state that old people's homes would be exempt from taxation without being used exclusively for charitable purposes. *Korzen* then furnished guidelines to determine if the uses to which property was being put were charitable. It was stated that a charitable use is one for the benefit of an indefinite number of persons; that its funds are derived mainly from public and private charity; that charity is dispensed to all who need and apply for it and without obstacles placed in the way of those who need and would avail themselves of the charitable benefits dispensed; and, finally, that the term "exclusively used" means the primary purpose for which property is used and not any secondary or incidental purpose. 39 Ill.2d 149, 157.

In *Korzen* we also stated that the mere charging of fees, including monthly charges, would not necessarily disqualify the property from charitable use. We observed, however, that varying the charge on the basis of the size and desirability of the facility or room did not suggest charitable use. The failure to admit those who are unable

to pay the required fee did not suggest a charitable use. The main source of income resulting from current charges, rather than gifts, bequests and donations did not suggest a charitable use. The absence of a legal obligation to keep and maintain any person who became unable to fulfill his financial obligation or otherwise became sick or unmanageable did not indicate a charitable purpose. The observations made in *Korzen* are applicable to the case at bar.

In *People ex rel. Nordlund v. Winnebago Home for the Aged* (1968), 40 Ill.2d 91, we observed that applicants to the old people's home were required to be 65 years of age, to pay a $4,000 entrance fee, to be in reasonably good health and mentally capable, and to assign their social security benefits and title to property to the association. Thereupon it became obligated to provide housing, medical care, food, and burial. The assets of the association were approximately 68% from gifts and endowments and 32% from contributions of the residents. Again, we noted that the organizational makeup and use of property appeared to conform to the statutory language contained in section 19.7 of the Revenue Act of 1939. We reiterated that the association must further comply unequivocally with the constitutional requirement of exclusive charitable use and that that determination is a judicial function, which may not be usurped by the legislature. 40 Ill.2d 91, 100.

We concluded that the requirement of a sizable admission fee and the assignment of assets could not be reconciled with the charitable requirement that benefits be applied to an indefinite number of people, that charity be dispensed to all who need and apply for it, that obstacles not be placed in the way of those who need and would avail themselves of the benefits provided. We noted that in its relatively long period of operation, the association had admitted only two people who could not pay its admission fee.

In *Wesley Willows v. Munson* (1969), 43 Ill.2d 203,

the residents of the old people's home were required to pay an entrance fee varying from $9,000 to $20,500, depending upon the type of room and location to be assigned to the applicant. The monthly charges ranged from $200 upwards. There was no requirement that the home admit any person it found unable to pay the entrance fee or the monthly service charge. The home was not required to provide care or shelter for any person who might become unmanageable because of illness. We again observed that while the charging of the fee did not necessarily remove the home from the categorization of a charitable institution, the allocation of living space based upon the amount of the fee, coupled with the other factors in the case, suggested that the home's primary concern was not the dispensing of charity, but rather the providing of suitable living quarters for those who could afford it.

The rationale of the foregoing cases is applicable to this case. Substantial monthly charges were paid by all of the residents of the home. Unlike the cited cases, an entrance fee was not required. We do not consider this distinction to be significant, particularly in view of the substantial monthly charges imposed and the requirement of a three-month payment at the inception of one's stay at the home. The operating income totaled $465,000, was derived almost entirely from the monthly rental charges, and was approximately $33,000 in excess of the operating expenses, exclusive of depreciation. It appears to us that the greatest source of funds is not from either private or public charity. The variance of the monthly charges, based upon size or location of a room, smacks of the practices found in the cited cases as being indicative of a noncharitable use. The fact that during its period of operation, the Heritage House has admitted no one who was apparently unable to pay the monthly charges; and the further fact that it has never had a resident who was unable to pay these substantial monthly charges, indicates that the

property is not used for charitable purposes—the benefit of an indefinite number of people, and that financial obstacles are placed in the way of aged persons who may be needing the benefits that the home provides. We conclude that the property in question is not in fact exclusively used for charitable purposes.

Heritage House further claims that taxation of its property constitutes a denial of equal protection of the laws in that if it chose to bring its property within the Illinois Health Facilities Authority Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1101 *et seq.*) it could obtain exemption from taxation. We find that fact of little significance. (See *Lehnhausen v. Lakeshore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001.) The significant factor here really is that if the Heritage House chose to use its property exclusively for a charitable purpose it likewise could obtain the benefits of exemption from taxation. This same factor is decisive of Heritage House's contention that it is denied equal protection of the laws in that it is treated differently from other charitable organizations. It points out that hospitals make charges to cover their operating expenses. As was pointed out herein, and in *Korzen, Winnebago* and *Munson,* the fact that an institution makes charges does not necessarily remove it from the classification of a charitable institution. Those who charge fees, yet admit persons who need and seek the benefits offered but are unable to pay the customary fees, do not lose their charitable character. Heritage House has not been denied equal protection of the laws. It merely has failed to come within the classification entitled to exemption.

In *Methodist Old Peoples Home v. Korzen* (1968), 39 Ill.2d 149, this court construed section 19.7 of the Revenue Act. What we said there is particularly applicable here. At page 156 this court stated:

"In interpreting House Bill 1328 we must assume that the legislature did not intend to

exceed its constitutional limitations. As we stated recently, 'it is our duty to construe acts of the legislature so as to uphold their constitutionality and validity if it can reasonably be done, and, further, that if their construction is doubtful, the doubt will be resolved in favor of the validity of the law attacked.' *Illinois Crime Investigating Commission v. Buccieri,* 36 Ill.2d 556, 561. See also *MacMurray College v. Wright,* 38 Ill.2d 272; *Follett's Illinois Book and Supply Store, Inc. v. Isaacs,* 27 Ill.2d 600.

In keeping with such assumption we hold that the legislature did not intend to deviate from the constitutional requirement that to be exempt from taxation the property of an old peoples home must be used exclusively for charitable purposes. In amending section 19.7 of the Revenue Act of 1939 (Ill. Rev. Stat. 1965, ch. 120, par. 500.7) House Bill 1328 did nothing more than add language which was descriptive and illustrative of 'old people's homes.' Any doubts concerning this are dispelled by its statement that 'this definition shall be construed as declaratory of the existing law and not as a new enactment.' "

We are of the opinion that the trial court erred in granting summary judgment to the plaintiff, and that the trial court should have granted the defendants' motion for summary judgment. Accordingly, the judgment of the appellate court is reversed and the cause is remanded to the trial court for further proceedings consistent herewith.

*Reversed and remanded, with directions.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.