2026 IL App (4th) 241539

NO. 4-24-1539

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 29, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| FIRST UNITED METHODIST CHURCH, PEKIN, ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Tazewell County |
| v. | ) | No. 24MR38 |
| THE DEPARTMENT OF REVENUE and DAVID | ) | |
| HARRIS, in His Official Capacity as Director of the | ) | Honorable |
| Department of Revenue, | ) | Steven A. Kouri, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justice Vancil concurred in the judgment and opinion.
Justice DeArmond dissented, with opinion.

**OPINION**

¶ 1        Plaintiff First United Methodist Church of Pekin, Illinois (Church), was gifted a single-family residence in Pekin, Illinois, to be used in a housing ministry. The Church sought a property tax exemption for the property for tax year 2021 under sections 15-40 (religious purpose) and 15-65 (charitable purpose) of the Property Tax Code (Tax Code) (35 ILCS 200/15-40, 15-65 (West 2020)). Defendant David Harris, the director of the Illinois Department of Revenue (Director), ultimately denied the request as to both exemptions, and plaintiff filed a complaint for administrative review in the circuit court.

¶ 2        The circuit court reversed the Director's decision, finding that the home was exempt from taxation under section 15-65's charitable purpose exemption. Defendants Director and the Illinois Department of Revenue (Department) now appeal from that order.

¶ 3 We reverse the Director's decision and affirm the circuit court.

¶ 4 I. BACKGROUND

¶ 5 A. Charis Place

¶ 6 The subject property, which the Church named "Charis Place," is a 1,070 square foot, two-bedroom family home with a basement located in Pekin, Illinois. The Church was gifted the property on May 7, 2021, "on the condition that is be used for a housing ministry to transform lives for Christ through a ministry with families in transition by providing housing, spiritual guidance, and other support as identified by each family together with the ministry team." As part of the gift transfer, "[t]he church agreed that the home [would] be used in the ministry and not sold for general church purposes." The Church ministry that supports Charis Place is called ROCHouse Ministry.

¶ 7 B. Application for Exemption

¶ 8 On May 20, 2021, plaintiff filed an application for a nonhomestead property tax exemption for tax year 2021 under section 15-40's religious purposes exemption. Later in the proceedings, the Church also requested a charitable purposes exemption under section 15-65 of the Tax Code. Defendants stipulated that the additional exemption ground could be considered.

¶ 9 In its exemption application, the Church stated that "[t]he property will be used as transformational housing for families who are facing housing insecurity." It further stated that, "[d]epending on the situation a family may be charged a fee as part of their program toward responsible home or apartment occupancy" and that at the time, a "standard lease [was] in the process of being prepared which will define the covenants and conditions of occupancy."

¶ 10 C. Supporting Documentation

¶ 11 The Church filed several documents with its application, including the affidavit of

use prepared by Scott Ewing, the chair of the Church's board of trustees; the March 11, 2021, of the ROCHouse leadership team (ROC Team) meeting minutes; the amended minutes of the Church's April 20, 2021, trustees' meeting; and the May 7, 2021, warranty deed.

¶ 12    Ewing's affidavit stated that the Church had a twofold mission: a global mission to " 'make disciples of Jesus Christ for the transformation of the world' " and a local mission to " 'unite every one [*sic*] with the life giving power of Jesus.' " It further stated that, "[i]n light of both missions, [the Church] was called to serve and be in a ministry with its community." The affidavit reiterated how the Church acquired the property, its intended use, that establishment of the ROCHouse Ministry was "approved on March 11, 2021[,] and the receipt of the gift of Charis Place was approved on April 21, 2021." According to the affidavit, the Church was "in the process of re-roofing the house, purchasing and installing appliances and determining the extent of other furnishings that will be provided and obtaining the same." At the time the affidavit was prepared, it was anticipated that the initial repair work would be completed by early summer 2021, applications for residency could be reviewed in July 2021, and a family could begin occupancy in August 2021.

¶ 13    According to its March 11, 2021, meeting minutes, the ROC Team was authorized to submit a grant application to the Church's endowment committee "to request $10,000.00 to support the ROCHouse ministry." A motion was also approved to accept a $1,000 donation to be used for the ROCHouse ministry. Finally, the minutes stated that "[a] temporary restricted fund [was] authorized for the ROCHouse ministry." The amended minutes of April 20, 2021, revealed that an individual named "Denise" would "provide the new shingles for the roof" and have them "paid for prior to the closing." We note that Denise Hocker is listed as a member of the ROC Team in the March 11, 2021, minutes.

¶ 14                                    D. Initial Hearings

¶ 15        On July 1, 2021, the Department denied the request, finding that the property was "not in exempt use." Plaintiff filed a protest and asked for an administrative hearing. The protest letter stated that the church believed the request for an exemption was denied "because the Church stated that it might receive income from its operation of a ministry at the property," but it asserted that the "[p]rogram income from the operation of an exempt charity is not grounds for denial of [a] real estate tax exemption."

¶ 16                                    1. *Additional Evidence*

¶ 17        At the request of the parties, the administrative law judge (ALJ) allowed the parties to submit a "Joint Stipulation of Facts and Waiver of Oral Hearing" in lieu of an administrative hearing. It stated, in part, as follows:

> "1. The [Church] has filed a property tax exemption application for First United Methodist Church Pekin, Illinois.
>
> 2. The [Church] has filed a timely written request, pursuant to 35 ILCS 200/8-35, for a formal hearing of the Department's denial of its application, setting forth the [Church's] arguments as to why the denial was incorrect and as to why the denial should be reconsidered and reversed.
>
> 3. The [Church] applicant has filed its appeal based on whether the taxpayer qualifies for an exemption as a charitable organization under Section 15-65 of the Property Tax Code (35 ILCS 200/15-65 [(West 2020)])."

¶ 18        The parties further stipulated to the submission of a joint exhibit containing additional documents, including the Department's "documents, records, and/or memorandum" relating to its determination. The joint exhibit provided a copy of the lease agreement, a ministry

- 4 -

plan covenant, a copy of the gift agreement showing the transfer of Charis Place, and an affidavit of Kathy Simpson, a member of the Church and member of the ROC Team. Simpson's affidavit stated that the Church board had voted unanimously to establish the ROC Team, that the first resident had moved into Charis Place in September 2021, and that an agreement (ministry covenant) had been worked out between the tenant and the ROC Team. According to the affidavit, "The church is subsidizing all the costs associated with the ministry with donations and grants from church related funds. While [the tenant's] rent starts at zero and will increase over time it will not cover our programmatic costs." The affidavit also stated that the Church was able to "gift [the tenant] with $100 each month for food to replace the state aid and help keep her on track with expenses."

¶ 19        She added that the "goals outlined in the covenant" with the tenant were "that while living at Charis Place she will:

> "1. Become financially able to provide a permanent, safe, happy home to raise her children[; and]
>
> 2. Be able to reduce stress and find peace in her own living."

The affidavit further stated, "Through the ministry of Charis Place [the tenant] has the peace of mind of living in a safe neighborhood in a well-maintained, comfortable home for her and her family."

¶ 20        The affidavit also explained why the ROC Team decided to utilize a written lease and why it adopted certain lease provisions. According to the affidavit, the ROC Team

> "consulted with several community organizations including Teen Challenge, Esther House, Salvation Army, and others who work with individuals and families in transition. One aspect pointed out by these programs was that if their residents did

not comply with program guidelines and rules, they could be immediately barred from the property."

Simpson's affidavit then explained that the ROC Team "decided that though our ministry is programmatic like theirs, we would give our residents the added protection of a tenancy agreement." She further stated, "We believe the agreement is one way to help our residents learn how to be good tenants/homeowners as they transition."

¶ 21        The parties also introduced the Church's ministry plan covenant, which noted the following facts pertinent to this appeal: (1) the Church offered Charis Place rent-free for the first 12 months and covered 50% of utility costs, with rent increasing to $100 in month 13 and an additional $25 per month thereafter until the end of 24 months (meaning that the final month's rent was to be $375); (2) the tenant will pay 100% of utility costs for months 13 through 24; (3) the tenant will apply certain monies toward the payment of existing debts and thereafter will begin a savings program; (4) the Church will make a 50% charitable scholarship available to tenant to attend a Financial Peace University workshop at the Church; and (5) the Church will provide a spiritual mentor "to meet with [the tenant] on a regular schedule to introduce bible study and explore faith issues," and the tenant "will meet with her mentor on a schedule agreed upon by both parties."

¶ 22        As noted by the ALJ below, the lease of Charis Place resembles "a traditional residential lease agreement." The exception to that characterization is the modest amount of monthly rent payments due to the Church, which begin at $0 for the first year and gradually work up to the sum of $375 in the twenty-fourth month. The lease provides that the Church is entitled to a security deposit, but it then states that the amount of the security deposit is "ZERO dollars." The lease also sets forth the Church's obligation to be "financially responsible" for all repairs to

the structure, as well as its responsibility to reimburse the tenant for half of all utility payments for the first 12 months of occupancy.

¶ 23                                2. *ALJ Recommendation for Disposition*

¶ 24        The ALJ recommended the Department's denial of the tax exemptions be upheld because Charis Place served neither a religious nor charitable purpose under the Tax Code.

¶ 25                                a. Compliance With *Korzen*

¶ 26        Concerning the charitable purpose exemption, the ALJ observed that the Illinois Supreme Court in *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 156-57 (1968) (*per curiam*), set out the distinctive characteristics of a charitable institution: (1) it has no capital, capital stock, or shareholders; (2) it earns no profits or dividends, but derives its funds mainly from public and private charity and holds them in trust for the purposes designated in its charter; (3) it dispenses charity to all who need and apply for it; (4) it does not provide gain or profit in a private sense; and (5) it does not appear to place obstacles in the way of those who need and would avail themselves of the charitable benefits it dispenses. The Department stipulated that the Church had satisfied *Korzen* factors one and four; thus, the remaining disputed issues concerned *Korzen* factors two, three, and five.

¶ 27                                i. *Funds Derived From Private Charity Sources*

¶ 28        The ALJ found that the Church had "failed to establish that its funds [were] derived mainly from public and private charity" and that "the funds are held in trust for the objects and purposes expressed in the charter of ministry." According to the ALJ, "the record does not contain any documentation regarding the funding described in the meeting minutes and the affidavit." The court stated, "While the [Church] makes assertions and statements regarding the funding, there is no documentary evidence to show that [its] funding is derived mainly from public and private

charity for the tax period at issue." The ALJ further explained, "the [Church] did not provide any documentation to support the existence of the funding, such as when it was received and the source of the funding." The ALJ noted that Simpson's affidavit had stated that the Church was subsidizing the costs of the ministry with "donations and grants" from Church-related funds, "[y]et, the record does not contain any documentary evidence of the source of the donations, donor lists, or amounts of the donations." The ALJ further stated, "Likewise, no grants were submitted into the record to determine the dollar amounts of the funding and the source of the grant funding."

¶ 29                              ii. *Dispersal of Charity to All Who Need It*

¶ 30          Concerning the third *Korzen* factor, the ALJ concluded that the Church failed to establish that it disperses charity to all who need and apply for it. According to the ALJ, "While the record did contain the application, interview questions and cover letter that was used by the [Church] to advertise Charis Place, the parcel at issue in this matter is a private single-family residence and only one family can be living at the residence at one time." The ALJ found that "[t]his limiting factor does not support a finding that [the Church] dispenses charity to *all* who need or apply for it." (Emphasis in original.) According to the ALJ, because Charis Place "can only house one family at time, it cannot be said that this private single-family residence benefits an indefinite number of persons."

¶ 31                              iii. *Obstacles in the Way of Those Who Need Charity*

¶ 32          The ALJ further concluded that the Church had failed to establish that it did not place obstacles in the way of those who needed and would avail themselves of the charitable benefits it dispenses. According to the ALJ, a review of the lease provisions shows it "contains additional strict and punitive provisions." The ALJ cited provisions for a bookkeeping charge for dishonored checks, a locking fee for failure to return keys, and late fees of "$1.00 per day for rent

- 8 -

not received timely." The ALJ further noted there was a crime-free housing addendum, a pet agreement requiring the tenant to pay for pet damage, and penalties for "repeated non-compliance with the Ministry Plan." According to the ALJ, "reviewing the totality of the lease agreement, Charis [Place] [was] limited to people who adhere to the Ministry Plan and therefore not available to all who need or avail themselves of the benefits of Charis [Place]." Further, "the lease and addendum provisions resemble a traditional residential lease agreement rather than characteristic of a charitable institution."

¶ 33                                    b. Charitable Use

¶ 34        The ALJ then addressed the Church's primary use of the property during the relevant tax year. The ALJ stated, "Here, the Charis [Place]'s primary use was a private single-family residence and there was no record evidence of any use of the property for a charitable purpose." The ALJ concluded that even if the Church was operating as a charitable institution, there was "no evidence that the parcel itself [was] being primarily used to implement [the] goals" of ministry. The ALJ stated, "[T]here is no evidence of any meetings or other services being conducted on the premises of the parcel that would further the housing ministry's programs and services." According to the ALJ, the property's use was solely as a private single-family residence.

¶ 35        For these reasons, the ALJ denied the claimed charitable purpose exemption.

¶ 36                                    c. Religious Exemption

¶ 37        Although the Department did not dispute that the Church was a religious organization, the ALJ denied the requested religious exemption, finding that Charis Place was not used primarily for religious purposes during the tax year in question, again relying on its logic that the housing was a private single-family residence.

¶ 38        The Church filed a timely appeal to the Director.

¶ 39                                    E. Director's Decision

¶ 40            On February 22, 2024, the Director accepted the ALJ's recommendation of disposition without further comment. On March 21, 2024, the Church filed a timely complaint for administrative review in the circuit court. See 735 ILCS 5/3-103 (West 2024). As the Director adopted the ALJ's recommendations *in toto*, we will from this point refer to the content of the ALJ's report as the Director's decision.

¶ 41                            F. Circuit Court Administrative Review

¶ 42            In the circuit court, the Church again argued that the Charis Place property was exempt under sections 15-40 and 15-65 of the Tax Code. After taking the matter under advisement, the court issued a written order on November 8, 2024, stating as follows:

              "Upon consideration of Plaintiff's Complaint for Administrative Review, the Court finds and orders as follows:

                    1. Plaintiff is a charitable institution under the *Korzen* factors. See *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149 (1968). Specifically, the Court places considerable weight on the primary use of the subject property for charitable purposes. In this regard, the Court finds that the terms of the lease were below fair market value (*i.e.*, for example, no rent for the first 12 months).

                    2. The [Department] primarily argues that the church's property does not qualify for charitable exception because the use does not serve an infinite number of people and is not dispensed to all who need and apply for it. This Court is not prepared to accept that narrow of an application of the *Korzen* factors. The Department of Revenue's interpretation of the *Korzen*

factors under the circumstances presented herein would, in effect, prevent any single-family residence from ever being tax exempt.

3. The Court shares the concerns of the [D]epartment. The Court does not make a blanket ruling on the maximum duration of a lease for any given recipient. It is significant to the Court that in this particular case the duration was no more than two years.

Based on the foregoing, the Court finds that the findings and conclusions by the [Director] are against the manifest weight of the evidence and are clearly erroneous. Therefore, the decision of the [Director] is reversed." (Internal quotation marks omitted.)

¶ 43 This appeal followed.

¶ 44 II. ANALYSIS

¶ 45 On appeal, defendants argue that the circuit court's decision to award the charitable purpose exemption for the 2021 tax year should be reversed and the Director's decision reinstated, thereby denying the requested exemption. Additionally, defendants argue that, if the charitable exemption does not apply, the religious exemption advanced by the Church in the alternative also cannot support exemption of the 2021 taxes.

¶ 46 A. Standard of Review

¶ 47 An appellate court reviews the final decision of the administrative agency and not the decision of the circuit court. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207 (1999); *Key Outdoor, Inc. v. Department of Transportation*, 322 Ill. App. 3d 316, 320 (2001). Here, the final agency decision was rendered by the Director, who adopted the report of the ALJ.

- 11 -

¶ 48        The degree of deference given to the Director's decision depends on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30. "An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence." *Key Outdoor, Inc.*, 322 Ill. App. 3d at 320 (citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)). "Questions of law decided by such an agency are not entitled to deference and are reviewed *de novo.*" *Id.* (citing *Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 214 (1994)). A mixed question of law and fact is reviewed for clear error. *Western Illinois University*, 2021 IL 126082, ¶ 30.

¶ 49        Where the resolution of the case requires determining the legal effect of a given set of facts, the agency's determination should be affirmed unless clearly erroneous. *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 693 (2008). As was the case in *Three Angels Broadcasting Network, Inc.*, the determinative facts here—that is, the actual uses to which the subject property was put—are not in dispute. *Id.* The issue is whether, given the undisputed facts presented, the Church is entitled to a property tax exemption on one of the bases it claims. *Id.*

¶ 50        An agency's decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed. *American Academy of Pediatrics v. Department of Revenue*, 2023 IL App (2d) 210718, ¶ 37 (citing *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50). "While this standard is highly deferential, it does not relegate judicial

review to mere blind deference of an agency's order." *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 98 (2007).

¶ 51                                    B. Jurisdiction

¶ 52         Although neither party has questioned our jurisdiction over the appeal, the dissent correctly notes that we have an independent duty to examine it. While the jurisdictional inquiry is an important one, our review leads us to a conclusion different from that reached by the dissent.

¶ 53         We agree that a final order disposing of fewer than all "claims" is not an appealable order absent an appropriate finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). *Marsh v. Evangelical Covenant Church of Hinsdale*, 138 Ill. 2d 458, 464 (1990). However, even if this case had been brought in the circuit court as a court of original jurisdiction, our view is that there would still be only one claim presented: a claim to establish that the Church was entitled to an exemption on its 2021 property taxes. Here, the Church received all the relief it could have obtained when the circuit court ruled that the property was tax exempt. The fact that the circuit court did so on the basis of the charitable exemption, rather than the religious exemption, does not mean that there is a separate "claim" hanging in the wind and yet to be addressed. The only relief that could be obtained *was* obtained, so there was no concrete controversy presented by the abstract question of whether the same result could be reached under the religious exemption; doing so could not make the property *more* exempt.

¶ 54         The fact is, however, that this was *not* an action in the circuit court as a matter of original jurisdiction, but an action initiated with the Department and decided by the Director; it arrived in the circuit court only on judicial administrative review. The requirement for finality arises with respect to the Director's decision. See *Slepicka v. Illinois Department of Public Health*,

- 13 -

2014 IL 116927, ¶ 12 (noting the provision for "judicial review of a final administrative decision"). There is no issue here about the finality of the Director's decision.

¶ 55　　　　In the circuit court, there was only one action: a single-count complaint for administrative review asking that the administrative decision be reversed. The advancement of different bases for the same relief does not turn a single claim for administrative review into multiple claims. See *Ikpoh v. Zollar*, 321 Ill. App. 3d 41, 47 (2001) (stating the advancement of three separate bases for achieving restoration of the plaintiff's medical license did not constitute three separate claims). On administrative review, "circuit courts act as the first-tier courts of review" (*Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 213 (2008)), and the circuit court's relationship with the agency "is analogous to the relationship between a trial court in a nonadministrative review proceeding and an appellate court" (*Ikpoh*, 321 Ill. App. 3d at 47). "Courts of review *** ordinarily will not consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided." *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990). The circuit court's decision not to address the alternative grounds for tax exemption is entirely proper in its role as a reviewing court, and failing to address the charitable basis for exemption did not affect the finality of its decision granting the Church the entirety of the relief it requested.

¶ 56　　　　Finally, we note that even if the circuit court had addressed the alternative religious ground for exemption, it would not affect our analysis of the case. "On appeal from an administrative case, we review the administrative agency's decision and not the trial court's determination." *City of East Peoria v. Melton*, 2023 IL App (4th) 220281, ¶ 50. Consequently, the circuit court's failure to review the alternative ground for an exemption has had no effect on our disposition of the case.

¶ 57 For all the foregoing reasons, we conclude that we have jurisdiction over this appeal.

¶ 58 C. Exemptions

¶ 59 The Church sought a property tax exemption for Charis Place for the tax year 2021 under two different provisions of the Tax Code: section 15-40 (establishing the religious exemption) and section 15-65 (establishing the charitable exemption). 35 ILCS 200/15-40, 15-65 (West 2020).

¶ 60 1. *General Taxation Authority*

¶ 61 "Article IX of the 1970 Illinois Constitution [(Ill. Const. 1970, art. IX)] generally subjects all real property to taxation." *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 285 (2004); *Oswald v. Hamer*, 2018 IL 122203, ¶ 12. "Under Illinois law, taxation is the rule. Tax exemption is the exception." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 388 (2010). The constitution does, however, give the legislature the authority to exempt particular kinds of properties from taxation. Section 6 of article IX provides as follows: "The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, *religious*, cemetery and *charitable purposes*." (Emphases added.) Ill. Const. 1970, art. IX, § 6. "It is permissible, not mandatory, for the legislature to exercise" this constitutional authority to grant tax exemptions. *Oswald*, 2018 IL 122203, ¶ 13. "Where the legislature does choose to provide for an exemption, it must remain within constitutional limitations," and it "cannot add to or broaden" the exemptions permitted under section 6. (Internal quotation marks omitted.) *Id.* ¶ 14. Statutory exemptions are construed narrowly and strictly in favor of taxation. *Swank v. Department of Revenue*, 336 Ill. App. 3d 851,

855 (2003). "The party claiming an exemption carries the burden of proving clearly that the use of the subject property is within both the constitutional authorization and the terms of the statute under which the claim of exemption is made." (Emphasis omitted.) *Oswald*, 2018 IL 122203, ¶ 18; *Evangelical Hospitals Corp. v. Department of Revenue*, 223 Ill. App. 3d 225, 231 (1991).

¶ 62                                      2. *Charitable Use Exemption*

¶ 63          One category of exemption that the legislature may constitutionally adopt is an exemption for property used for "charitable purposes." See *Evangelical Hospitals Corp.*, 223 Ill. App. 3d at 230-31. Consequently, regardless of what else the legislature may provide for, it is independently true that "[a]n applicant for a charitable-use property tax exemption must 'comply unequivocally with the constitutional requirement of exclusive charitable use.' " *Eden Retirement Center*, 213 Ill. 2d at 287 (quoting *Small v. Pangle*, 60 Ill. 2d 510, 516 (1975)). A property owner seeking a charitable use exemption must satisfy both the particular statutory exemption relied upon as well as the constitutional limitation. *Oswald*, 2018 IL 122203, ¶ 39.

¶ 64                          a. The Nature of the *Korzen* Factors

¶ 65          In *Korzen*, the supreme court listed six distinctive characteristics of a charitable institution: (1) the institution bestows benefits upon an indefinite number of persons for their general welfare, or the benefits in some way reduce the burdens on government; (2) it has no capital, capital stock, or shareholders, and the funds of the institution are derived mainly from private and public charity and are held in trust for the purposes expressed in the charter; (3) it dispenses charity to all who need and apply for it; (4) it does not provide gain or profit in a private sense to any person connected with it; (5) it puts no obstacles in the way of those seeking the charitable benefits; and (6) the primary use of the property is for charitable purposes. *Korzen*, 39 Ill. 2d at 157.

¶ 66    This is where things get murky. *Korzen* purported to address the constitutional limitation on what could be made exempt by the legislature. However, the Illinois Constitution expresses that limitation in terms of the *use* to which the property is put, not the nature of the institution that owns the property. The constitution specifies that the legislature is authorized to exempt "property *used* exclusively for agricultural and horticultural societies, and for school, religious, cemetery and charitable purposes." (Emphasis added.) Ill. Const. 1970, art. IX, § 6. When the legislature decided to exercise its constitutional authority to exempt property "used exclusively for *** charitable purposes" (*id.*), it required not just that the property be "actually and exclusively used for charitable or beneficent purposes" but that it be owned by an "[i]nstitution[ ] of public charity" (35 ILCS 200/15-65(a) (West 2020)).

¶ 67    Therein lies the confusion. *Korzen* purports to define the constitutional boundaries of a use-based charitable exemption, yet it speaks in terms of the hallmarks of a charitable *institution*. The statute, on the other hand, adds a separate requirement that the property be owned by a charitable *institution*, but case law seems to look to *Korzen*'s constitutional *use* test to determine what constitutes a charitable institution. See *Provena*, 236 Ill. 2d at 390 (stating that the *Korzen* factors identify "the distinctive characteristics of a charitable institution").

¶ 68    It may be a challenge to make pristine logical sense of the application of the *Korzen* factors, but it is possible to find clarity by following their application in subsequent supreme court cases. Practically speaking, the supreme court appears to have looked to the *Korzen* factors to examine both the statutory requirement that the organization be charitable in nature (see *id.*; *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271 (1996) (stating a property owner "can qualify as a charitable organization only by satisfying the criteria set forth" in *Korzen*)) and the dual constitutional and statutory requirement that the *use* be charitable in nature

(*Eden Retirement Center*, 213 Ill. 2d at 287 (stating *Korzen* "articulated guidelines or criteria for resolving the constitutional question of charitable use"); *Small*, 60 Ill. 2d at 515 ("*Korzen* then furnished guidelines to determine if the uses to which property was being put were charitable.")).

¶ 69        The fact that the *Korzen* factors have been utilized to test both the institution's status as a charitable institution and the dual constitutional/statutory use requirement should not be surprising because the first five *Korzen* factors relate to the charitable nature of the organization, while the sixth focuses on the charitable nature of the use. As we have previously found, "the statutory ownership considerations embedded in section 15-86 inherently overlap with *Korzen*'s ownership factors." *The Carle Foundation v. Department of Revenue*, 2023 IL App (4th) 200121, ¶ 148.

¶ 70        Consequently, we now examine application of the *Korzen* factors to the facts of this case. We note that the individual factors were laid out in *Korzen* in a narrative form, rather than in a numbered list; as noted above, the factors as laid out by the Department do not always correlate with the same numbered factors found in the caselaw. For clarity, we will utilize the enumeration of the factors as set forth in *Provena*.

¶ 71                            b. Application of the *Korzen* Factors

¶ 72        As we held in *Carle Foundation*, the *Korzen* factors "are guidelines, not strict requirements, that courts consider and balance by examining the facts of each case." *Id.* ¶ 146. Illinois courts have not applied a rigid formula to all factual scenarios in determining eligibility for a charitable real estate tax exemption. *Du Page County Board of Review v. Joint Comm'n on Accreditation of Healthcare Organizations*, 274 Ill. App. 3d 461, 469 (1995). "Rather, courts consider and balance the guidelines by examining the facts of each case and focusing on whether and how the institution serves the public interest and lessens the State burden." *Id.*

¶ 73                                    i. *No Capital, Stock, or Shareholders*

¶ 74         The Department concedes that the Church has no capital, capital stock, or shareholders. Its structure is clearly more like that of a charitable institution and not a private business.

¶ 75         ii. *No Profits and Funding Derived From Charity and Held in Trust*

¶ 76         The Director found that the Church failed to establish that its funds were derived mainly from public and private charity and that "the funds [were] held in trust for the objects and purposes expressed in the charter or ministry." Moreover, it concluded the record did not present any documentation to show where the funds came from.

¶ 77         As for the Church itself, the record reflects no other source of income beyond what one might expect for a church, *i.e.*, the contributions made by its membership. As to the funds relating specifically to Charis Place, the record shows that the property itself was a gift to the Church for the purposes of establishing a "housing ministry to transform lives for Christ through a ministry with families in transition by providing housing, spiritual guidance, and other support as identified by each family together" with the ROC Team. The affidavit of use prepared by the chair of the Church's board of trustees explained that the Church was "in the process of re-roofing the house, purchasing and installing new appliances and determining the extent of other furnishings that will be provided and obtaining the same." The March 11 minutes of the ROC Team meeting state that authorization was given to submit a grant application to the Church's endowment committee "to request $10,000.00 to support the ROCHouse Ministry." A motion was also approved to accept a $1,000 donation to be used for the ROCHouse Ministry.

¶ 78         Additionally, the affidavit of Simpson, a member of the ROC Team, stated, "The church is subsidizing all the costs associated with the ministry with donations and grants from

church related funds." The record demonstrates that "[a] temporary restricted fund [was] authorized for the ROCHouse Ministry," which oversees the administration and ministry of Charis Place. Thus, ROCHouse Ministry funds come from the Church, and there is a restricted fund designated for it. All funding for Charis Place was paid for by the Church from donors. Although the Director took issue with the statement that some of the funds would come from a grant, we note that this is clearly a reference to a grant from another *internal* Church fund, not an external source. No evidence points to funding from other sources.

¶ 79 The record is clear that, far from being profitable, the ROCHouse project was a money-losing proposition for the Church. The record is unclear what a market-rate monthly rental for the property would be. However, if we assume that the highest monthly rate of $375 was the market rate, the property would generate total rent receipts of $9,000 if rented at that rate for two full calendar years. With the first year's rent completely forgiven and the second year's inching up by small amounts each month, the total rental revenue received from the property over two years would be only $2,850, or less than one-third of what the property might have earned commercially—if that were the point of the exercise. This does not consider the many additional expenditures made by the Church for the betterment of the property and its residents.

¶ 80 Accordingly, the record contains clear evidence establishing that the property did not generate profit for the Church and that the source of its funding was private and public charity.

¶ 81 iii. *Dispenses Charity to All Who Are in Need and Apply*

¶ 82 The Director found that the Church failed to establish by clear and convincing evidence that it dispenses charity to all who need it and who apply to receive it. In reaching its conclusion, the Director found it significant that Charis Place was "a private single-family residence" and that "only one family can be living at the residence at a time." According to the

Director, "[t]his limiting factor does not support a finding that [the Church] dispenses charity to *all* who need or apply for it." (Emphasis in original.) The Director's analysis applies a portion of *Korzen* that is not specifically one of the individual factors: that a charity exists "for the benefit of an indefinite number of persons *** for their general welfare—or in some way reducing the burdens of government." *Korzen*, 39 Ill. 2d at 157.

¶ 83    The Department is essentially focused on the *scale* of the Church's charitable effort, rather than its nature. It notes that "a two-bedroom single-family residence can benefit only [a] small number of people at a time," further stating that while it would be "interesting," but unnecessary, to consider "whether the church's case would be stronger if it applied for an exemption for six tiny homes or 100 homes." In focusing intently on the *number* of people served, the Department essentially assumes that there can be only large charities, not small ones.

¶ 84    To understand the intention behind this *Korzen* factor, we examine the case *Korzen* cited to support it: *Sisters of the Third Order of St. Francis v. Board of Review of Peoria County*, 231 Ill. 317 (1907). The relevant portion of that case is the following:

> "It is then argued that this hospital should not be held to be an institution of public charity by reason of the great disparity between the number of charity patients and those who pay for the care and attention they receive at this institution. This objection seems to us without merit, *so long as charity was dispensed to all those who needed it and who applied therefor*, and so long as no private gain or profit came to any person connected with the institution, and so long as it does not appear that any obstacle, of any character, was by the corporation placed in the way of those who might need charity of the kind dispensed by this institution, calculated to prevent such persons making application to or obtaining admission to the

hospital. The institution could not extend its benefactions to those who did not need them, or to those who did not seek admission." (Emphasis added.) *Id.* at 322.

¶ 85 Viewed in context, *Sisters of Third Order* does not suggest that the charity was required to offer unlimited medical services beyond its physical ability to provide them. The point of the passage cited above is that, although the hospital had some patients who paid for care, it was not dedicating some token amount of its facilities to those in need and then characterizing itself as a charitable institution. Applied here, we can see that the Church has dedicated *all* of its only church-owned residential property for use by those less fortunate and in need of assistance. The Church is seeking a charitable exemption for only *one* property, and its use of that is not any less charitable because it cannot house more than one needy family at a time.

¶ 86 The Department stumbles in its use of the word "indefinite" claiming it to mean, in essence, "infinite." In other words, unless *all* persons in need are served by a charitable enterprise, it cannot be a charity. In fact, the word "indefinite" simply means "not precise" or "having no exact limits." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/indefinite (last visited June 18, 2026) [https://perma.cc/3KHZ-33LH]. In other words, the organization set aside the benefits of its charity for an identified group of persons. No authority has been brought to our attention to suggest that charity cannot, as here, be limited to those in need, nor that a charity that cannot physically accommodate all comers is not charitable in nature. Every soup kitchen might at some point run out of soup, and every orphanage may at some point find all of its beds filled; neither situation would diminish the charitable nature of the organization's activities.

¶ 87 The property at issue is a small one, described in the record as a 1,070 square foot, two bedroom, one bathroom residential dwelling. Its assessed value for the 2021 tax year was

$28,990, so the amount of tax revenue it generates is undoubtedly modest. Regardless, the Director's tendency to denigrate the charitable nature of the property's use by suggesting that it could serve only one family at a time, or that it could not serve an "indefinite" number of people, is divorced from an understanding of the nature of the property. The expectations for the property's charitable use must, in our view, be reasonably proportionate to the property itself.

¶ 88         In discussing the concept of benefitting "an indefinite number of persons," *Korzen* also refers to the concept of "reducing the burdens of government." *Korzen*, 39 Ill. 2d at 157. Again, we do not read this to mean that the organization must reduce *all* governmental burdens in order to be charitable. Small organizations cannot extend the same degree of charity as much larger ones, but the issue is the nature of the activity, not its scale. Here, we know that Charis Place is specifically designed to benefit one family at a time, though potentially multiple families in sequence. In the case of the current occupants, we know that they were recipients of government housing subsidies before taking up residence in Charis Place. It is unmistakable that the Church's charitable effort has reduced the burden on the government. It may be a small benefit, but one that is commensurate with the property's small size (and small tax revenue generated).

¶ 89         We conclude that the Church is making the benefit of reduced-cost housing available to all who apply, even if only one family in need can be accommodated at one time.

¶ 90                  iv. *No Private Gain or Profit to Connected Persons*

¶ 91         There is no evidence in the record to suggest that the property is utilized for the private benefit of church leaders or other insiders.

¶ 92                  v. *No Obstacles to Receiving the Charitable Benefit*

¶ 93         The Director also found that the Church had failed to establish that it did not place obstacles in the way of those who need and would avail themselves of the charitable benefit

dispensed. On this point, the Director placed great emphasis on the provisions of the lease agreement between the ministry and the tenant, finding they were strict and punitive and more closely resembled a traditional lease agreement than a characteristic of a charitable institution. Looking at these provisions, we note that many of the lease agreement charges criticized by the Department are minimal. For example, the lease provides for a bookkeeping charge of $25 for dishonored checks or debit card payments, a $100 lock changing fee for failure to return keys, and late fees of $1 per day for rent not timely received. These fees are charged only in the event of a lease violation; a tenant who complies with the provisions suffers no consequences. The provisions do not limit who may benefit from the low-rent residency. Moreover, there is no reason to think that such conditions act as a disincentive to prospective occupants when there is zero rent charged for the first year and severely reduced rent for the second.

¶ 94        The Director found it significant that there were several prohibitions in the clauses requiring crime-free premises and the pet addendum. Again, these are reasonable provisions and help establish the occupant in a supportive tenancy so that transitioning to a commercial tenancy or home ownership might be easier. Moreover, this crime-free provision is required by local laws. We take judicial notice that Pekin City Code section 6-10-9, titled "Crime-free lease addendum," provides that, "No owner of non-owner-occupied housing may rent, lease, or authorizing occupancy of any non-owner-occupied housing without requiring the occupant or occupants to sign a crime-free lease addendum, regardless of whether any formal written lease is executed." Pekin City Code § 6-10-9 (amended May 28, 2019); see *Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 725 (2009) ("[N]otwithstanding section 3-110 [of the Administrative Review Law (735 ILCS 5/3-110 (West 2008)), prohibiting consideration of new evidence], documents containing readily verifiable facts may be judicially noticed if taking judicial notice will 'aid in

the efficient disposition of a case.' *Muller v. Zollar*, 267 Ill. App. 3339, 341 *** (1994).”). Placing reasonable restrictions on a tenant's use of the property does not alter its charitable use, especially where, as here, the property is being used in furtherance of a program designed to help low-income individuals transition to improved housing and the “restriction” is required by law.

¶ 95    The evidence presented shows that the ROC Team consulted with similar organizations and found that most imposed requirements and consequences on their tenants. The Church decided to craft a written agreement spelling out the parties' relative rights and obligations, a practice which offers clarity to the arrangement. Any conditions on the use of the property cannot be said to constitute a restriction as contemplated by *Korzen* and its progeny. Each condition is not only reasonable (or legally mandated), but it also advances the overall goal of preparing the tenant to transition to independent housing (likely involving similar lease provisions). The terms of the arrangement remain markedly favorable to the resident of the property.

¶ 96                    vi. *Use Primarily for Charitable Purposes*

¶ 97    We now turn to the requirement that the Church's use of the property was primarily for charitable purposes. Although this factor is the final part of the *Korzen* assessment, the Department treats it as a stand-alone consideration. See *Eden Retirement Center*, 213 Ill. 2d at 287. Section 15-65 of the Tax Code provides that, “[a]ll property of [an institution of public charity] is exempt when actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit.” 35 ILCS 200/15-65 (West 2020).

¶ 98    The Director's decision is singularly focused on the *tenant's* use of the property as a single-family residence, assuming that this overrides the *Church's* charitable act in making the property available to families in need at a greatly reduced cost. The Department concedes that “[r]ent collection alone does not defeat a charitable exemption,” but it argues that the “lease

payments and other financial responsibilities on the tenant [are] something not typically the hallmark of charity." But the question here is not whether the Charis Place project is a *typical* charity, but whether it is charity nonetheless. Surely charity can take many forms, but in looking at the situation myopically, the Department overlooks the substantial benefits to the tenant and the costs to the Church.

¶ 99 The charitable act here is the provision of reduced-cost housing to individuals in need of assistance and assistance in the transition to a more self-sustaining lifestyle. To simply focus on the *tenant's* use of the property as a single-family residence is shortsighted and overlooks the *Church's* use of the property: to promote the larger goals of its ministry. Charis Place is without question a money-losing proposition for the Church, as it will receive only a small fraction of the rent it might charge if the property were marketed commercially. The Church sustains that loss explicitly for the benefit of the family, which learns the skills necessary to move toward housing independence. It is a cramped view of charity to think that only giving a man a fish can constitute charity, while teaching him to fish cannot. It has long been recognized that assisting those in need " 'to establish themselves for life' " is a charitable activity. *Crerar v. Williams*, 145 Ill. 625, 643 (1893) (quoting *Jackson v. Phillips*, 96 Mass. 539, 556 (1867)).

¶ 100 It is well settled that property satisfies the exclusive use requirement if it is primarily used for the exempted purpose, even though it is used for a secondary or ancillary one. *Resurrection Lutheran Church v. Department of Revenue*, 212 Ill. App. 3d 964, 972 (1991). The test is whether the primary purpose of the property is charitable or whether it is the making of profit and the devoting of these profits to charitable purposes. *Id.* (citing *People v. Young Men's Christian Ass'n of Chicago*, 365 Ill. 118, 123 (1936)). Here, Charis Place was not operated for a profit, and it relied on the support of Church funds and donations to fill the gap. The primary use

of the property was the embodiment of the Church's ministry to "transform lives for Christ through a ministry with families in transition by providing housing, spiritual guidance, and other support." Any use of the property as a single-family residence should only be viewed in the context of the Church's charitable purpose.

¶ 101    In *Highland Park Women's Club v. Department of Revenue*, 206 Ill. App. 3d 447, 454, 464 (1990), the court held that the property at issue (Ravinia Park) was operated as "a charitable organization engaged in the promotion of the arts, including music, dance, and theater, by putting on performances at the Park and making the performances readily available to the public through low admission prices," and its Opportunity Program, which brought in disadvantaged youths, inner-city groups, senior citizens, and disabled persons. The court found that "fostering appreciation of the arts through the performances on the premises" was the primary purpose of that parcel of land. *Id.* at 464. The court did not focus on the simple fact that the land was a park where performances occurred. It looked instead to what the performances supported, which was public charity. The fact that there might be other for-profit music venues did not defeat the charitable nature of the venue in question, just as the existence of other residential properties leased for profit does not defeat the essential charitable nature of Charis Place.

¶ 102                    vii. *Consideration of All Factors*

¶ 103    The consideration of all factors, including the final factor exploring the property's charitable use, leaves us with the firm conviction that the Director's denial of a charitable use exemption for the Church's Charis Place property was clear error. The Director's determination must be reversed.

¶ 104            3. *Exemptions Under Section 15-40—Religious Purposes*

¶ 105    Because we have determined that the Church's request for an exemption for the 2021 tax year can be resolved on the basis that it is entitled to a charitable exemption, we need not address the alternative contention that the property qualifies for a religious exemption.

¶ 106                                    III. CONCLUSION

¶ 107    For the reasons stated, we affirm the circuit court's decision. The Director's decision to deny the Church's claimed property tax exemption is reversed.

¶ 108    Circuit court judgment affirmed.

¶ 109    Director's decision reversed.

¶ 110    JUSTICE DeARMOND, dissenting:

¶ 111    I respectfully dissent because I believe we lack jurisdiction to provide the relief granted. Although neither party questions our jurisdiction, we have an independent duty to examine our jurisdiction and dismiss this appeal if jurisdiction is lacking. *MidFirst Bank v. McNeal*, 2016 IL App (1st) 150465, ¶ 12. "Whether we have jurisdiction is a question of law that we review *de novo*." *O'Gara v. O'Gara*, 2022 IL App (1st) 210013, ¶ 29.

¶ 112    Section 3-112 of the Code of Civil Procedure provides, "A final decision, order, or judgment of the Circuit Court, entered in an action to review a decision of an administrative agency, is reviewable by appeal as in other civil cases." 735 ILCS 5/3-112 (West 2024). This means, as relevant to this case, parties may appeal a trial court's final judgment involving an administrative proceeding to the appellate court located in the same judicial district. *Wilkey v. Illinois Racing Board*, 96 Ill. 2d 245, 249 (1983) (citing Ill. Const. 1970, art. VI, § 6). As for appeals from nonfinal judgments involving administrative proceedings, the rules on appeals enacted by our supreme court apply. *Wilkey*, 96 Ill. 2d at 249.

¶ 113    "The law is well established that unless specifically authorized by the rules of [the

- 28 -

supreme] court, the appellate court has no jurisdiction to review judgments, orders or decrees which are not final." (Internal quotation marks omitted.) *Ikpoh*, 321 Ill. App. 3d at 44. "An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate part thereof." (Internal quotation marks omitted.) *Ikpoh*, 321 Ill. App. 3d at 44-45. "The ultimate question to be decided in each case is whether the judgment fully and finally disposes of the rights of the parties to the cause so that no material controverted issue remains to be determined." (Internal quotation marks omitted.) *Ikpoh*, 321 Ill. App. 3d at 45.

¶ 114 One rule from our supreme court that allows us to consider judgments that are not final in all respects is Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), which provides, in relevant part, as follows:

> "If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgement as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both."

Here, plaintiff sought administrative review, in the trial court, of the Director's decision accepting the ALJ's recommendation that plaintiff was not entitled to tax exemptions under sections 15-40 and 15-65 of the Tax Code. The parties addressed both exemptions in the proceedings before the court. The trial court reversed the Director's decision, addressing only the charitable purpose exemption under 15-65 of the Tax Code, and defendants appealed to us, the proper appellate court. See *Wilkey*, 96 Ill. 2d at 249.

¶ 115 Clearly, the trial court's order reversing the Director's decision on the charitable purpose exemption was final as to that claim. See *Ikpoh*, 321 Ill. App. 3d at 44. However, the

court never ruled on whether plaintiff was entitled to an exemption under section 15-40 of the Tax Code. Thus, that claim remains pending. The fact both counts alleged an exemption does not mean they involved the same claim for purposes of Rule 304(a). Rather, when a complaint seeks different bases for recovery, a ruling as to fewer than all those bases is not final and cannot be appealed absent a Rule 304(a) finding. See *Heinrich v. Peabody International Corp.*, 99 Ill. 2d 344, 348 (1984) (in an appeal of an order with a Rule 304(a) finding, our supreme court observed, "when the bases for recovery under the counts that are dismissed are different than those under the counts left standing [because, among other reasons, they derive from different statutes], the dismissal is appealable because it disposes of a distinct cause of action").

¶ 116    Accordingly, to appeal in this case, the Department needed to ask the trial court to enter a Rule 304(a) finding on November 8, 2024, which would have allowed us to consider only whether plaintiff was entitled to a charitable purpose exemption. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 23 (recognizing only rulings on claims that are final may be appealed under Rule 304(a) when the proper finding is made); *Harreld v. Butler*, 2014 IL App (2d) 131065, ¶ 14 (providing that a Rule 304(a) finding cannot be entered *nunc pro tunc* when the failure to enter the finding was not a clerical error). Of course, the Department also could have asked the court to rule on the claim for a religious purpose exemption, which, after a ruling was entered, would have allowed us to consider both exemptions on appeal. See *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 556 (2009) ("Absent [a Rule 304(a)] finding, if an order finally resolves one claim against one party, but other claims and/or other parties remain pending, an appeal from the final order must wait until the other matters have been resolved."). The problem for the Department is it did neither in this case.

¶ 117 I suggest seeking different exemptions under the Tax Code is sufficiently akin to seeking recovery under separate theories, so as to constitute separate claims, which would have required a Rule 304(a) finding. Here, the bases for recovery—exemptions for religious and charitable purposes—were different. See *Cunningham v. Brown*, 22 Ill. 2d 23, 25 (1961) (stating that where the bases for recovery are different, it does not matter that recovery under one would bar recovery of additional damages under the other). The charitable and religious exemptions are separate bases for recovery arising from different sections of the Tax Code and no ruling was made on the religious exemption.

¶ 118 Although the recovery sought—an exemption from property taxes—is similar, it is nevertheless separate and distinct. What is needed to establish a religious exemption (see *Grace Community Church Assemblies of God v. Department of Revenue*, 409 Ill. App. 3d 480, 487-88 (2011)) is different from what is needed to prove a charitable exemption (see *Korzen*, 39 Ill. 2d at 156-57). Thus, what needs to be proved to establish each exemption (each basis for recovery) is different, and therefore, I believe the religious and charitable purposes exemptions are separate claims for purposes of Rule 304(a). Because no Rule 304(a) finding was entered and the religious exemption was not ruled on, I believe we lack jurisdiction over this appeal.

*First United Methodist Church v. Department of Revenue*, **2026 IL App (4th) 241539**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 24-MR-38; the Hon. Steven A. Kouri, Judge, presiding. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for appellants. |
| **Attorneys for Appellee:** | Valerie M. Moehle, of Moehle Law Firm, Ltd., of Pekin, for appellee. |